### HIBBARD, ADMX. *v.* HIBBARD

[No. 17,581. Filed May 23, 1947. Rehearing denied September 30, 1947. Transfer denied April 29, 1948.]

*Robison & Robison,* both of Frankfort, attorneys for appellant.

*Gruber & Morrison,* both of Frankfort, attorneys for appellee.

CRUMPACKER, C. J.—Sometime in 1944, prior to July 5, the appellee Lewis C. Hibbard and his son Howard R. Hibbard, then 26 years of age, presented themselves at the Farmers Bank of Frankfort, Indiana, and Howard R. Hibbard, the son, stated to Carl W. Agnew, the bank's cashier, that he wanted to open a joint account between his father and himself and asked the procedure for doing so. Agnew produced a depositor's signature card upon which the following printed matter appears:

### "JOINT ACCOUNT—PAYABLE TO EITHER OR SURVIVOR

"We agree and declare that all funds now, or hereafter, deposited in this account are, and shall be, our joint property and owned by us as joint tenants with right of survivorship, and not as

tenants in common; and upon the death of either of us any balance in said account shall become the absolute property of the survivor. The entire account or any' part thereof may be withdrawn by, or upon the order of, either of us or the survivor.

"It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns and personal representatives."

This card was read by Agnew to both father and son and the meaning explained to them after which they both signed it and an account was opened in accordance with its terms. No money was deposited in the account on that day and shortly thereafter Howard, a pilot in the Army Air Force, was sent overseas. Periodically, beginning July 5, 1944, he mailed government checks to the Farmers Bank for deposit in said account. These checks were part of his salary as a pilot in the Army Air Force and aggregated, at the time of death, on June 8, 1945, the sum of $3,450. Lewis C. Hibbard, the father, made no deposits whatever to the credit of said account and shortly after his son's death withdrew the entire balance therein and converted the same to his own use.

The said Howard R. Hibbard died intestate leaving his widow Eileen Clifton Hibbard, whom he had married on January 22, 1944, as his sole and only heir at law. The said Eileen Clifton Hibbard was duly appointed administratrix of her deceased husband's estate and as such, through the medium of this suit, she seeks to void the joint account agreement heretofore set out and to recover the money deposited under its terms as assets of her decedent's estate.

She contends that the appellee's right to such money can be upheld only on the theory that said joint de-

posit agreement is a binding contract between the parties or that the money deposited thereunder was a gift *in praesenti* from the son to his father. The agreement is not a binding contract, she says, because it was executed (1) through the undue influence of the appellee, and (2) wholly without consideration. It is of no validity as a gift, she contends, because (1) her decedent, as the donor, never parted with control of the subject matter of the alleged gift, and (2) as no money was deposited in the account when it was opened the agreement must be construed as a mere promise to give in the future and therefore void.

It is the law that where all the funds in a bank account held in joint tenancy have been deposited by one party, it must appear that the other party's interest therein rests upon a valid contract, gift or trust. 48 C.J.S., Joint Tenancy, § 3, p. 925. It becomes important therefore to determine the validity of the deposit agreement here involved. As above stated the appellant's first complaint is that such agreement was executed by her decedent through the undue influence of the appellee. She rests her case in that respect on two facts: (1) the appellee and her decedent were parent and child respectively; and (2) the appellee, the parent and presumably the dominant party, profited by the transaction. This, she contends, makes a *prima facie* case on the theory of undue influence and, there being no evidence or circumstances in rebuttal, the judgment against her is contrary to law.

In *Wesphal* v. *Heckman* (1916), 185 Ind. 88, 93, 113 N. E. 299, we find the following statement of principle:

"There are certain legal and domestic relations in respect to which the law raises a presumption

of trust and confidence on one side and a corresponding influence on the other. The relations of attorney and client, principal and agent, husband and wife, and parent and child belong to this class and there may be others. Where such a relation exists between two persons and the one occupying the superior position has dealt with the other in such a way as to sustain a substantial advantage, the law will presume that improper influence was exerted and that the transaction is fraudulent.

"This so-called presumption, when indulged, arises out of relations which exist between the contracting parties regardless of any facts or circumstances having a tendency to show that a confidence was reposed by one of the parties and an influence gained by the other. Proof of the existence of such a relation between the parties establishes *prima facie* that the dominant party to such relation occupies a position of trust and confidence which he must not abuse."

In the Wesphal case, however, there were many facts and circumstances in addition to the mere relationship of the parties which had a bearing on the question of undue influence and to that extent so broad a statement of the rule was perhaps unnecessary. In almost identical language *Keys* v. *McDowell* (1913), 54 Ind. App. 263, 100 N. E. 385, lays down the same rule although, there also, there was much evidence on the question of undue influence in addition to the relation of confidence and trust that existed between the parties. So far as we have been able to discover this is the first occasion in Indiana upon which a court has been called upon to declare the rule upon a hypothesis which includes nothing but the bare relationship. There is nothing in the Wesphal and Keys cases, however, to indicate that the rule expressed therein would have been modified

or changed had there been no evidence on the undue influence issue and we therefore hold that proof of the relationship of parent and child between the appellee and appellant's decedent, out of which the appellee profited, made a *prima facie* case of undue influence.

The legal presumption which aids the appellant vanishes however in the face of evidence to the contrary. The appellant's decedent was an adult 26 years of age at the time he executed the deposit agreement in controversy. In 1943 he was inducted into the U. S. Army Air Force where he qualified as a pilot, and the court takes judicial knowledge of the rigorous physical and mental requirements of such service. Prior to that time he had been employed by the Lockheed Aircraft Corporation for about a year and one-half. It thus appears that for at least two and one-half years prior to the execution of the deposit agreement he had been completely emancipated from parental dominion. The account was opened as a joint account with right of survivorship at his own request and in doing so he had the counsel of the bank's cashier, a party wholly disinterested in the ownership of any money that might be deposited therein. The appellee took no part in these negotiations and as far as the record discloses said nothing. Decedent made no deposits in the account until months later when he was overseas and far removed from immediate parental influence, yet he made them with full knowledge that, by the terms of the account, they became the joint property of the appellee with right of survivorship. The appellee appeared as a witness and the trial court had the opportunity to judge his age, health and vigor and to form its own opinion as to his character. Under such circumstances we think the question of undue in-

fluence was one of fact for the trial court to determine and having done so we are bound thereby.

The appellant next contends that the deposit agreement, under the terms of which the appellee possessed himself of the money in dispute, must fall for want of consideration. It is true that said agreement neither expresses a consideration nor is there any evidence on the subject but we attach no significance to such facts. The statutory law of this state recognizes joint tenancies in personal property, § 51-104, Burns' 1933, but our courts have said that property so held does not go to the survivor unless it is so expressly stipulated in the instrument creating the estate. *Johnson, Trustee* v. *Johnson* (1891), 128 Ind. 93, 96, 27 N. E. 340. The present agreement provides for the right of survivorship in unequivocal terms and in language that is not susceptible to misconstruction. It necessarily follows that the appellant's decedent and the appellee had the right to create a joint tenancy with right of survivorship in a bank account and this they did by the execution of the written agreement in controversy. In *Kennedy* v. *McMurray* (1915), 169 Cal. 287, 146 Pac. 647, the Supreme Court of California had under consideration a deposit agreement very similar in its terms to the one before us, signed by a father and his daughter. The father made all the deposits that were, from time to time, credited to the account and on his death his personal representative and the daughter each claimed the money. The court said it was the father's money, in his lifetime, and he could do with it as he pleased and there is no principle of law which would prevent him from making his daughter a joint owner with him of all money he chose to put in the account. The controlling question involved was whether

the instrument clearly discloses an intention on the part of the father, when deposits were made by him to the account of himself and daughter, to constitute such deposits the joint property of himself and her. In determining that question the court said: "In our opinion the instrument executed by the deceased Kennedy and the appellant in opening the account with the bank clearly constituted the monies deposited therein and in controversy here the joint property of both of them and vested in the appellant survivor of such joint ownership all interest therein and the sole right to withdraw them." The instrument before us indicates unequivocally that the appellant's decedent intended to constitute all deposits made by him to the account involved the joint property of himself and father with right of survivorship. This he had the right to do, being of sound mind and under no restraint, and the fact that there was no consideration for his action is of no consequence because his declaration of intention as evidenced by the written agreement, consummated by his subsequent deposits, constituted a series of gifts *in praesenti* of a joint interest with right of survivorship in the money involved. See *Matthew* v. *Moncrief* (1943), 77 App. D.C. 221, 135 F. 2d 645.

Judgment affirmed.

Royse, J. dissenting with opinion.

NOTE.—Reported in 73 N. E. 2d 181.

## DISSENTING OPINION

ROYSE, J.—The majority opinion squarely holds without qualification that if a parent receives anything of value from a child it is thereby prima faciely established that the benefit which the parent received

was obtained through the undue influence of such parent. In support of this holding it relies on the cases of *Westphal* v. *Heckman* (1916), 185 Ind. 88, 93, 113 N. E. 299, and *Keys* v. *McDowell et al.* (1913), 54 Ind. App. 263, 269, 100 N. E. 385.

In the Westphal case, *supra,* the Supreme Court did use the following language (quoted in the majority opinion herein) : "There are certain legal and domestic relations in respect to which the law raises a presumption of trust and confidence on one side and a corresponding influence on the other. The relations of attorney and client, principal and agent, husband and wife, and parent and child belong to this class and there may be others." In the Keys case, *supra,* the same statement was made with the addition of the relation of "pastor and parishioner." In my opinion the quoted statement in each of these cases, particularly as to the relationship of "parent and child" was *obiter dictum.* The Keys case did not in any manner involve the relationship of parent and child. The Westphal case involved a deed from father to son and it was there stated the rule quoted did not apply in such a case.

I believe the rule enunciated by the majority in this case is in conflict with the weight of American authority. It is unsound and establishes a most dangerous precedent which may seriously affect property rights. It places the ugly finger of suspicion on natural filial conduct. Under this rule, if a parent or parents had never had an education, were poverty stricken and unable to provide themselves with the necessities of life, had a son who had the advantage of a college education and had accumulated a vast fortune and was desirous of providing either or both with a decent home, etc.,

gave them a home and set up a trust fund to provide them with means to live decently—on the son's death such deed and trust fund could be set aside by his widow by merely showing the existence of the relationship. I think this is evil law.

The rule announced by the majority was repudiated in the case of *Hanna* v. *Ison* (1921), 76 Ind. App. 472, 476;. *et seq.*, 132 N. E. 316 (cited by appellee). In that case a deed from a daughter to her father was questioned. The court said:

"It is insisted that, when, in this case, *the relation of parent and child was shown*, the burden was then upon the father to show that the transaction was in all respects fair and honest.

"The authorities do not support this broad statement of the rule. In *Jenkins* v. *Pye* (1838), 12 Peters 241, 9 L. Ed. 1070, in which case a daughter twenty-three years of age had conveyed lands to her father, it was said: 'But the grounds mainly relied upon to invalidate the deed, were, that being from a daughter to her father, rendered it, as least, *prima facie* void. And if not void on this ground, it was so, because it was obtained by the undue influence of paternal authority. The first ground of objection seeks to establish the broad principle, that a deed from a child to a parent, conveying the real estate of the child, ought, upon considerations of public policy, growing out of the relation of the parties, to be deemed void; and numerous cases in the English chancery have been referred to, which are supposed to establish this principle. We do not deem it necessary to travel over all these authorities; we have looked into the leading cases, and cannot discover anything to warrant the broad and unqualified doctrine contended for on the part of the appellees. All the cases are accompanied with some ingredient, showing undue influence exercised by the parent, operating upon the fears or hopes of the child; and sufficient to show reasonable grounds to presume, that the act was not perfectly free and voluntary on the part

of the child; and in some cases although there may be circumstances tending, in some small degree, to show undue influence, yet, if the agreement appears reasonable, it has been considered enough to outweigh light circumstances, so as not to affect the validity of the deed.

" 'It becomes the less necessary for us to go into a critical examination of the English chancery doctrine on this subject, for should the cases be found to countenance it, we should not be disposed to adopt or sanction the broad principle contended for, that the deed of a child to a parent is to be deemed, *prima facie*, void. It is, undoubtedly, the duty of the courts carefully to watch and examine the circumstances attending transactions of this kind, when brought under review before them, to discover if any undue influence has been exercised in obtaining the conveyance. But to consider a parent disqualified to take a voluntary deed from his child, without consideration, on account of their relationship is assuming a principle at war with all filial as well as parental duty and affection; and acting on the presumption, that a parent, instead of wishing to promote the interest and welfare, would be seeking to overreach and defraud his child. Whereas, the presumption ought to be, in the absence of all proof tending to a contrary conclusion, that the advancement of the interest of the child was the object in view; and to presume the existence of circumstances conducing to that result. Such a presumption harmonizes with the moral obligations of a parent to provide for his child; and is founded upon the same benign principle that governs cases of purchases made by parents in the name of a child. The *prima facie* presumption is, that it was intended as an advancement to the child, and so not falling within the principle of a resulting trust. The natural and reasonable presumption, in all transactions of this kind, is, that a benefit was intended the child, because in the discharge of a moral and parental duty.'

"In *Towson* v. *Moore* (1889), 173 U. S. 17, 19 Sup. Ct. 332, 43 L. Ed. 597, the court, citing authorities to sustain the proposition, said: 'The

influence for which a will or deed will be annulled must be such as that the party making it has no free will, but stands *in vinculis.*'

"In a further discussion of the matter the court said: 'The principles established by these authorities may be summed up as follows: In the case of a child's gift of its property to a parent, the circumstances attending the transaction should be vigilantly and carefully scrutinized by the court, in order to ascertain whether there has been undue influence in procuring it; but it cannot be deemed *prima facie,* void; the presumption is in favor of its validity; and, in order to set it aside, the court must be satisfied that it was not the voluntary act of the donor. The same rule as to the burden of proof applies with equal, if not greater force to the case of a gift from a parent to a child, even if the effect of the gift is to confer upon a child, with whom the parent makes his home and is in peculiarly close relations, a larger share of the parent's estate than will be received by other children or grandchildren.'

" . . .

"When the parties to a transaction are *sui juris,* and are dealing with each other 'at arms length,' fraud is never presumed but must be clearly proven. When the parties are nearly related by blood, as in this case, but are each *sui juris,* something more than such blood relationship must be shown. There must be evidence showing a relationship of 'trust and confidence,' as recognized by the law, before any presumption of fraud arises against the defendant." (The emphasis in this quotation are the court's.)

In the Annotations at 35 A.L.R. 314, the following cases are cited to the effect that the mere fact the parent receives a benefit from the child does not cast a suspicion on the transactions: *Gregory* v. *Bowlsby* (1902), 115 Iowa 327, 88 N. W. 822; *Winkelman* v. *Winkelman* (1923), 307 Ill. 249, 138 N. E. 637; *Sloan* v. *McCortney* (1908), 108 N.Y.S. 840; *Goff* v. *Goff* (1916), 98 Kan.

201, 158 Pac. 26; *Kiser* v. *Sullivan* (1921), 106 Neb. 454, 184 N. W. 93.

In an apparent effort to relax the onerous effect of the new rule announced in this case, the majority overrules the long established rule that in cases where a confidential or fiduciary relationship exists it is incumbent on the dominant party to establish the integrity of his claim by substantial evidence. In the case of *Teegarden* v. *Ristine* (1914), 57 Ind. App. 158, 164, 106 N. E. 641, this court said: Where the "confidential relation is shown to exist and it is claimed that the party occupying the superior position has dealt with the one to whom he owes a duty arising out of such relation, and has gained a substantial advantage thereby, the burden is upon the one who holds such superior position of establishing that he acted in perfect good faith, gave the other party full and accurate information possessed by him, took no advantage of his knowledge, or influence over the other party, and that the contract or transaction was fair, equitable, voluntary and well understood. *Pomeroy* v. *Wimer* (1906), 167 Ind. 440, 447, 78 N. E. 233, 79 N. E. 446; *McCord* v. *Bright* (1909), 44 Ind. App. 275, 288, 87 N. E. 654; *Rochester* v. *Levering* (1886), 104 Ind. 562, 568, 4 N. E. 203; *French* v. *Cunningham* (1898), 149 Ind. 632, 637, 49 N. E. 797; *Wainright* v. *Smith* (1886), 106 Ind. 239, 242, 6 N. E. 333; *Huffman* v. *Huffman* (1905), 35 Ind. App. 643, 646, 73 N. E. 1096; *Fountain Coal Co.* v. *Phelps* (1884), 95 Ind. 271, 275; *Shirk* v. *Neible* (1901), 156 Ind. 66, 71, 59 N. E. 281, 83 Am. St. 150." See also *Kratli* v. *Booth* (1934), 99 Ind. App. 178, 183, 191 N. E. 180; *Johnson* v. *Fox* (1942), 110 Ind. App. 698, 704, 38 N. E. 2d 865.

In my opinion, where a relationship exists which makes out a *prima facie* case of undue influence, it

should take more than conjecture and surmise to overcome it. The majority opinion places no limitation on the new rule they adopt herein. Therefore, the age or education of the child would have no weight in overcoming the *prima facie* case. And, where undue influence has been established the mere fact that at the time the benefit was conferred the dominant party was not present does not remove the evil effect of such influence. In *Davis, Executor* v. *Babb* (1921), 190 Ind. 173, 180, 125 N. E. 403, the Supreme Court said:

> "Such is the nature of the human mind that, when it has been habituated to the influence of another, it will yield to that influence and suffer it to have its effect, although the person in the habit of its exercise may not be present or exert it at the time an act is done. *It may happen that the fruit of an evil and improper influence is born long after the influence is exerted.*" (My emphasis.)

I believe the question of undue influence in this case was one of fact to be determined by the trial court. The finding of the court being general is a finding against appellant on this issue. On the record I do not believe we can disturb such finding.

On the question of want of consideration raised by appellant, I believe the majority opinion departs from the theory of the parties and the trial court in this case. The appellant contends the signing of the card by decedent was an unenforceable agreement on his part which was unsupported by consideration, and that the burden was on appellee to show the agreement was supported by consideration because he was relying on this agreement. Appellant further contends the signing of the card by both decedent and appellee would preclude a showing of any consideration other than

that contained in the card, i.e., the mutual promises, one given for the other, and that in the absence of both making deposits, neither of the promises on said card would furnish consideration for the other, because neither promise bound the promissor to do anything in the absence of a deposit made by himself. Appellee made no deposits.

In answer to these contentions appellee in his brief says: "It may be contended that the contract itself does not show any consideration, it being contractual. We submit that this contract is not contractual, and, therefore, is open to inquiry and proof. [Citing quotation from *Inter-Ocean Casualty Co.* v. *Wilkins* (1932), 96 Ind. App. 231, 242, 182 N. E. 252, and *Brown* v. *Addington* (1944), 114 Ind. App. 404, 407, 52 N. E. 2d 640.] The contract in question does not specify any consideration. The father and son stated that all the funds 'shall be our joint property.' That the father may have agreed to do certain things in consideration of this contract, or that the son may have agreed to do certain things in consideration of this contract is not disclosed by the contract. There is nothing in the contract that says that in consideration of Howard Hibbard making deposits and in consideration of L. C. Hibbard making deposits in the account it shall become joint property. *We have to look beyond the written contract in the complaint to ascertain what the consideration was, and as decided by the cases above cited, when the contract does not show on its face the consideration, then parol evidence is admissible to prove the consideration.* Since parol evidence was admissible, and since appellant attempted to anticipate the defense and to avoid the same, thereby assuming the burden of proof, it rested upon appellant to produce evidence that there was no consideration

for this contract. Appellant introduced no such evidence." (My emphasis.)

I am of the opinion the deposit agreement does not express a consideration and was therefore subject to parol proof. *Inter-Ocean Casualty Co.* v. *Wilkins, supra; Brown* v. *Addington, supra.* Any right appellee had to the funds in this account were dependent on the deposit agreement. Therefore, the burden was on appellee to prove a valid consideration. In *Higham* v. *Harris* (1886), 108 Ind. 246, 8 N. E. 255, it is stated: "The settled rule is that one who relies on an . . . agreement in writing which does not show on its face that it was made upon an adequate consideration, must aver and prove that the contract is supported by a sufficient consideration." The fact that appellant in her complaint anticipated appellee's defense of a valid contract did not relieve appellee from the burden of proving adequate consideration. *Taylor* v. *Altgelt* (1946), 224 Ind. 383, 67 N. E. 2d 531, 532.

The case of *Kennedy* v. *McMurray* (1915), 169 Cal. 287, 146 P. 647, relied upon in the majority opinion, is not in point in this case because under the provisions of the Civil Code of California, §§ 1614, 1615, any written instrument presumes a consideration. In that case the Supreme Court of California recognized this fact. It held the mere fact a deposit is made by one person in the name of himself and another is not conclusive of his intention to create a joint ownership in the fund to which the incident of survivorship will attach as a matter of law. At page 650 of the 146 Pac., *supra,* the court said: "In the absence of any written instrument clearly disclosing his intention in those respects such intention was open to inquiry and to be determined from all the facts and circumstances connected with the deposit." In Indiana, except as to

negotiable instruments, we have no statute importing a consideration to written agreements.

The facts in this case are singularly different from those of any other case which I have found where a similar deposit agreement was considered. In this case no deposit was made at the time the agreement was signed by decedent and appellee. In all of the reported cases which I have found on this question there was either a deposit or a transfer of funds to the new account at the time the agreement was signed.

In *Gammon Theological Seminary* v. *Robbins* (1890), 128 Ind. 85, 27 N. E. 341, the written agreement before the Supreme Court was, in substance, as follows: I hereby give to the trustees the principal note of $700. . . . Said $700 to be given in trust to said trustees when the said note falls due (some three years later), and to be by them invested according to their best judgment. In an opinion by Judge Olds, the court held this written agreement did not transfer title to the note; that it was in effect a contract to give a sum in the future and was therefore void.

In *Reasner, Adm.* v. *Bohne* (1921), 76 Ind. App. 114, 129 N. E. 490, the decedent loaned the appellee $100 on his note which, at the request of decedent, was made payable to her granddaughter. Decedent kept this note until shortly before her death, when she gave it to her son with other papers. This court held that this transaction was not a gift of the note to the granddaughter and that the administrator was entitled to the proceeds of the note.

In the case of *Aetna Trust, etc., Co.* v. *Nackenhorst, Rec.* (1919), 188 Ind. 621, 630, 122 N. E. 421, our Supreme Court said: "A mere possibility cannot be the subject of an assignment."

In 7 Am. Jur. 300, 301, § 426, it is stated: "Where money belonging to one person is deposited to the account of himself and another, the relationship which is created depends primarily on the intention of the depositor. . . . Generally the right of the donee to the deposit on the death of the depositor rests upon the theory of a contract, gift or trust." The majority rule is that the mere fact that money is deposited to the account of the owner and another does not show an intent to make a gift. 7 Am. Jur. 302, § 428.

In sub-section (4) of § 3, 48 C.J.S. 925, 926, it is stated: "A bank account may be held in joint tenancy although all the funds have come from one of the parties, but the donee must establish his interest on the theory of gift, contract, or trust, unless such requirement is dispensed with by statute. The transfer may be upheld as a contract between donor and donee where there is a consideration."

The record in this case does not show a valid consideration. There is only a naked promise. The majority opinion is in conflict with ruling precedents of our Supreme Court. I believe a new trial should be granted.

NOTE.—Reported in 73 N. E. 2d 181.