WILLIAM C. JEWELL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7436–76.     Filed February 27, 1978.

*Robert N. Davies* and *Charles E. Schalliol*, for the petitioner. *Elsie Hall*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax in the amount of $4,393.94 for his

taxable year ending September 30, 1973. The issues for decision are:

(1) Whether petitioner is entitled to a deduction for medical expenses of his mother and father which were paid by checks drawn on his account and which constituted more than one-half the support of each of his parents, or were these expenses compensated for by insurance or otherwise within the meaning of section 213, I.R.C. 1954;[1]

(2) Whether petitioner is entitled to a dependency exemption for his mother; and

(3) Whether petitioner is entitled to compute his tax on the basis of the head of a household.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

William C. Jewell (petitioner) is an unmarried individual whose legal residence was in Valparaiso, Ind., at the time the petition in this case was filed. Petitioner, who is a certified public accountant, files his Federal income tax returns on the basis of a fiscal year ending September 30. He filed his return for the fiscal year ending September 30, 1973, with the Internal Revenue Service Center at Memphis, Tenn.

Ruth B. Jewell is petitioner's mother and William H. Jewell is petitioner's father. At all times relevant to this case they were married and were citizens of the United States. Ruth B. Jewell was born on March 7, 1895, and William H. Jewell was born on July 25, 1894. Petitioner is their only child.

Both Mr. and Mrs. Jewell have been in poor health for some years. Mrs. Jewell entered a nursing home in November 1969 and transferred to the Lake County Convalescent Home, Crown Point, Ind., on May 27, 1970. She has been a resident of that convalescent home since that date and has required and received continuous medical and nursing care. William H. Jewell lived in the home which he and Mrs. Jewell owned for some months after Mrs. Jewell entered a nursing home. After several hospitalizations with various illnesses, it was determined that Mr. Jewell needed nursing home care and in September 1970 he entered a

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

nursing home in Valparaiso, Ind., and on October 1, 1970, transferred to the Lake County Convalescent Home at Crown Point, Ind. Mr. Jewell has resided in the Lake County Convalescent Home since that date and has required and received continuous medical and nursing care.

Ruth B. Jewell and William H. Jewell did not file a joint Federal income tax return for the calendar year 1972. For that calendar year Mrs. Jewell's gross income for Federal income tax purposes was $506.80, consisting entirely of interest income. During the years 1972 and 1973, Mr. and Mrs. Jewell received social security payments. The total social security payments received by the two of them for the calendar year 1972 were $3,307.20. During the period January 1, 1973, through September 30, 1973, Mr. and Mrs. Jewell's social security payments totaled $2,845.50. During the years 1972 and 1973, William H. Jewell received pension checks in the amount of $40 each month, making a yearly total of $480. The only additional income which Mr. Jewell had was interest earned on savings accounts and certificates of deposits titled in the names of "William H. Jewell and/or Ruth Baxter Jewell and/or William C. Jewell." During the calendar year 1972, interest earned on these accounts totaled $3,016.07, and during the period January 1, 1973, through September 30, 1973, interest earned on these accounts totaled $2,595.

During 1972, all of Mr. and Mrs. Jewell's social security checks, pension checks, and interest income were deposited in savings accounts or savings certificates with the Citizens Federal Savings & Loan Association. None of petitioner's personal funds were deposited in those accounts or certificates in 1972. An account in the names of "William H. Jewell and/or Ruth Baxter Jewell and/or William C. Jewell" was first opened with the Citizens Federal Savings & Loan Association on February 1, 1956. This account was transferred on July 5, 1972, to another savings account, No. 303–044–9, which was opened at the Crown Point Branch of Citizens Federal Savings & Loan on July 5, 1972. This latter account was also titled in the names of "William H. Jewell and/or Ruth Baxter Jewell and/or William C. Jewell."

In 1956, when Mr. Jewell opened the account at Citizens Federal Savings & Loan, he told petitioner that petitioner's name was being put on the account in order to avoid the expense

of probate in the event of the death of both Mr. and Mrs. Jewell. After the account was opened, Mr. Jewell retained the passbook and did all banking connected with the account until his health became such that he was required to go to a nursing home. At that time he turned over the passbook to petitioner in order to enable petitioner to handle the banking functions of his parents. Thereafter petitioner did handle the banking functions in accordance with the instructions and approval of his parents. Any withdrawals made from the savings account were on slips signed by petitioner's father which petitioner made out and took to his father for signature.

Prior to petitioner's father entering the nursing home, the account in the joint names of Mr. and Mrs. Jewell and petitioner had a total of approximately $33,000 on deposit. Shortly after his father entered the nursing home petitioner arranged the sale of their house for them and when something over $13,000 was received from this sale in early January 1971 petitioner initially deposited the check in his own checking account and on January 19, 1971, transferred this amount, along with some other amounts which he had accumulated in his personal account from his deposit of his parents' social security checks, into a certificate of deposit. During 1971 petitioner deposited his parents' social security checks, as well as certain other funds of his parents, in his checking account from time to time and as of January 1, 1972, $4,375 of funds belonging to petitioner's parents had accumulated in petitioner's personal checking account. By March of 1972 all of these funds had been transferred into the savings accounts or certificates of deposit in the joint names of petitioner's parents and petitioner. Petitioner kept an accurate account of all deposits of his parents' funds made in his account and transferred to the accounts in the joint names the exact amount of these deposits. At all times after February 28, 1972, petitioner would take the social security checks and pension checks of his parents to the nursing home for them to endorse and would then deposit these checks in the joint name account. During 1971 and early 1972 petitioner accumulated funds from his parents' checks in his account as a convenience since he was occupied with his work, looking after his parents who were in ill health, and disposing of their home.

The total amount expended in support of Mrs. Jewell in the calendar year 1972 was $4,363.48. Of this amount $39.20 was

reimbursed by Medicare. In the calendar year 1972 the total amount expended for the support of Mr. Jewell was $4,808.67, of which amount $232.24 was reimbursed by Medicare or private insurance. Petitioner made payments by checks drawn on his personal checking account for all of the charges of the Lake County Convalescent Home incurred by Mrs. Jewell in 1972. These total payments amounted to $4,168.50, leaving after the Medicare reimbursement a total unreimbursed by Medicare of $4,129.30. Petitioner made payments by checks drawn on his personal checking account for all of the charges of the Lake County Convalescent Home incurred by Mr. Jewell in 1972. This total amount was $4,137. The $232.24 reimbursement by Medicare and private insurance was applicable to this amount, leaving an amount of $3,904.76 of payments to the convalescent home unreimbursed by Medicare or other insurance. Petitioner also made payments by checks drawn on his personal checking account in the amount of $391 for other medical expenses of his father in 1972.

During petitioner's taxable year ending September 30, 1973, he made payments by checks drawn on his personal checking account in the total amount of $3,993.50 for medical expenses of Mrs. Jewell, of which amount insurance, private and Medicare, reimbursed $87.20, leaving a total amount unreimbursed by insurance of $3,906.30. During the fiscal year ending September 30, 1973, petitioner made payments by checks drawn on his personal checking account for medical expenses for his father of $4,099.50 of which $146.72 was reimbursed by Medicare or private insurance, leaving a total payment of $3,952.78 which was not reimbursed by either Medicare or private insurance. During the fiscal year ending September 30, 1973, petitioner paid, for his own medical expenses, $106.20 which was not reimbursed by insurance or otherwise.

As of January 1, 1972, the certificates of deposit and savings accounts in the joint names of Mr. and Mrs. Jewell and petitioner totaled $51,258; as of December 31, 1972, these accounts totaled $57,510; and as of September 30, 1973, they totaled $62,680.

During 1972 and 1973 withdrawals were made from the Citizens Federal Savings & Loan account on withdrawal slips signed by petitioner's father in the total amount of $475.65, which amount petitioner's father gave to petitioner and which

petitioner designated as reimbursement of incidental expenses other than medical expenses of Mr. and Mrs. Jewell. Petitioner's father had discussed with petitioner that even though he was concerned that the funds he and Mrs. Jewell had would not be sufficient to last during their lifetime, he would want to pay a part of their yearly expenses. Petitioner told his father that it would be preferable if the expenses paid by his father were other than medical expenses. In accordance with this conversation, petitioner kept an account of expenses other than medical expenses that he paid by check for his mother and father (including the 10 cents per check for checks written on his personal account for their benefit), and the $475.65 which he received from his father was in payment of these expenses. These expenses did not include items which petitioner purchased by cash and took to his parents when he visited them, such as toilet articles, candy, and similar items. Petitioner handled all the banking for his parents, including withdrawals and deposits, but did not endorse their checks or sign withdrawal slips.

During the period January 1, 1972, through September 30, 1973, no withdrawals were made from the Citizens Federal Savings & Loan for petitioner's own use. However, on November 2, 1973, petitioner withdrew $1,000 from the savings account at the Crown Point Branch of the Citizens Federal Savings & Loan which amount he designated as a "personal loan" from his parents to him. Petitioner repaid the $1,000 on December 20, 1973, by making a deposit to the account from which the amount had been withdrawn, but he did not make any interest payment on the $1,000. In early November 1973 petitioner was in the process of changing his employment and was short of cash flow in his personal checking account. At that time a $750 payment was due at the Lake County Convalescent Home and for this reason he withdrew and designated as a loan the $1,000 from the joint account in the names of his parents and petitioner.

During the year here involved petitioner's parents were in such a state of health that they relied heavily on his recommendations with respect to the handling of their financial affairs. Each of petitioner's parents had a will written leaving his or her entire estate to the surviving spouse, but if the spouse did not survive the property was to go to petitioner. While petitioner was aware of these wills, it was his opinion that in effect they

were unnecessary since the only assets which his parents had were in the joint account titled in their names along with his.

At the time Mrs. Jewell originally entered the convalescent home the daily cost of care of a person in that home was $9. As of June 1977 the cost had risen to $17 per person per day, and there had been announced a cost increase to $18.50 per day to take effect in September 1977. In the calendar year 1972, Mr. and Mrs. Jewell's total gross receipts, including nontaxable income from social security, were $7,541.44 and the total cost of their expenses at the nursing home was $9,172.15.

According to petitioner's computation, if his parents had paid their total expenses, including their medical expenses, from their own assets, their assets, except for social security payments and his father's pension payment, would have been depleted by 1979. No one other than petitioner relied on Mrs. Jewell as the source of the right to claim head of household filing status.

Petitioner on his income tax return for the fiscal year ending September 30, 1973, claimed medical expense deductions of $8,061 prior to the 3 percent of gross income reduction required under section 213. Included in these medical expenses claimed were the amounts of medical expenses petitioner paid for Mrs. Jewell and the amount paid for Mr. Jewell less, in each case, the Medicare or other insurance reimbursement. Petitioner on his return claimed Mrs. Jewell as a dependent and claimed the filing status of unmarried head of a household.

Respondent in his notice of deficiency disallowed the medical expenses claimed by petitioner for amounts paid for his mother and father, disallowed the exemption petitioner claimed for his mother, and recomputed his tax on the basis of a single taxpayer status rather than as the head of a household. Respondent stated as his reason for disallowing the medical expense deduction that the expenses paid by petitioner for his taxable year ending September 30, 1973, for medical care of his mother and father were compensated for by insurance or otherwise. Respondent's statement in explanation of disallowing petitioner's claimed dependency exemption for his mother was that petitioner had not established that he furnished more than one-half of Mrs. Jewell's support. Respondent explained the recomputation of the tax on the basis of a single taxpayer by stating that petitioner was not entitled to the head of a household rate since he had not

established that he was entitled to an exemption under section 151 for the taxable year for his mother.

### OPINION

Both parties recognize that the issues in this case are all dependent on our conclusion with respect to whether the medical expenses of petitioner's mother and father which were paid by checks drawn on petitioner's checking account were reimbursed to petitioner. Obviously, from the facts we have found, and as respondent recognizes, if petitioner was not in any way reimbursed for his payment of his mother's medical expenses she was his dependent within the meaning of section 151 and 152 and, since she was his dependent and he maintained a household for her at the nursing home, he is entitled to compute his tax on the basis of the head of a household. See *Robinson v. Commissioner*, 51 T.C. 520, 539 (1968).

Respondent also recognizes that since the medical expenses of petitioner's father constituted over half of his support in 1972, if petitioner received no reimbursement for these expenses, he is entitled to deduct those medical expenses. Petitioner is not entitled to a dependency exemption deduction for his father because of the amount of his father's gross income. However, a deduction for unreimbursed medical expenses paid by a taxpayer for a parent is allowable if those medical expenses constitute over half of the support of the parent. See sec. 213.

The parties have stipulated that the total medical expenses of both Mr. and Mrs. Jewell were paid by checks drawn on petitioner's personal account and that during the year here in issue none of the funds of Mr. or Mrs. Jewell were placed in petitioner's account. Also, the record is clear that petitioner did not claim as a deduction the small portion of the medical expenses he paid which were reimbursed by Medicare or private medical insurance.

It is respondent's position that because of petitioner's name being on the joint accounts with his mother and father he was fully reimbursed for the medical expense payments he made. It is petitioner's position that even though his name was on these accounts they were not in fact his funds or subject to his use for his own benefit and that, therefore, he was in no way reimbursed for the medical expenses he paid for his parents.

Petitioner argues that respondent in effect is saying that

because his parents had funds available to reimburse him for the payments he made he is not entitled to the claimed medical expense deductions, the dependency exemption for his mother, or to compute his tax as the head of household. Petitioner argues the fact that his parents had funds available with which he could have been reimbursed is immaterial.

The law is clear that when an individual pays a relative's medical expenses he is not entitled to a medical expense deduction to the extent he is reimbursed therefor, regardless of the form of reimbursement. In *Litchfield v. Commissioner*, 40 T.C. 967 (1963), affd. 330 F.2d 509 (1st Cir. 1964), we held that a taxpayer who paid all of the medical expenses for his dependent mother was not entitled to deduct the portion of those expenses reimbursed to him by his brothers. We specifically pointed out that the words "or otherwise" in section 213(a) require an offsetting of any form of reimbursement received against the total medical expenses paid. In *McDermid v. Commissioner*, 54 T.C. 1727 (1970), we held that where the funds from the pension checks of a dependent of the taxpayer were used along with the taxpayer's money to pay the dependent's medical expenses, only the portion paid by the taxpayer with his own funds was properly deductible. The facts there showed that the taxpayer drew checks for the total medical expenses on his checking account. However, he deposited the dependent's pension checks to his personal checking account and used the funds from those deposits along with his own funds in payment of the dependent's medical expenses. We pointed out that if the drawing of the check by the taxpayer could be viewed as his payment of the medical expense, that by depositing the dependent's pension checks to his account for his own use he was reimbursed in the amount of the checks so deposited. *Hodge v. Commissioner*, 44 T.C. 186 (1965), involved a somewhat similar situation. The taxpayer there was the guardian of his dependent mother. The mother received benefit payments through the Michigan State Department of Social Welfare and through the Social Security Administration. The taxpayer deposited these funds in his personal bank account and paid his mother's medical expenses from that account. In making his annual accounting to the Probate Court he reported the receipt of the benefit payments and the disbursements of those amounts for his mother's medical care. Again we pointed out that merely because the funds for

medical expenses were by checks drawn by the taxpayer he had not in a substantive sense paid for the medical expenses, or if he was considered to have paid those expenses, he was reimbursed to the extent of the benefit payments his mother received.

On the other hand we have made it clear that a dependency exemption does not depend on the available funds of the person claimed as a dependent if those funds are of a nontaxable nature. The determinative factor is who actually provides over one-half of the individual's support. In *Carter v. Commissioner*, 55 T.C. 109 (1970), we held that a taxpayer who actually paid more than one-half of his grandmother's support was entitled to a dependency exemption for his grandmother even though his grandmother had received State old-age assistance payments and health insurance payments which aggregated more than the amount the taxpayer paid for her support. The facts there showed that the grandmother had used a part of the funds she received for purposes other than her own support, and the part of the funds which she had used for her own support from her own receipts was less than the support paid for her by her grandson. We there pointed out that the manner in which the recipient spends old-age assistance payments is the critical test. Where the grandmother did not spend those payments for her own support to an extent equal to the support received from her grandson, her grandson properly claimed her as a dependent.[2] In our view, our holding in the *Carter* case is equally applicable with respect to medical expense payments. Even though petitioner's mother and father had funds available with which to pay their medical expenses and other support items, if in fact these funds were not used for that purpose and were not in any way transferred to petitioner for his use, then petitioner who in fact paid the medical expenses was not reimbursed for those expenses and is entitled to the claimed deduction.

Respondent relies on cases such as *Kentucky Utilities Co. v. Glenn*, 394 F.2d 631 (6th Cir. 1968), and *Bartlett v. United States*, 397 F. Supp. 216 (D. Md. 1975), to support his contention. These cases hold that a taxpayer is not entitled to a deduction for a casualty loss when the casualty was covered by insurance even though he chose not to make a claim for reimbursement under

---

[2]See also *Nordstrom v. Commissioner*, T.C. Memo. 1971-20, in which we allowed a dependency exemption to a taxpayer where his mother, for whom he made support payments, received social security benefits but used them to pay funeral expenses for another son and other nonsupport items.

his insurance policy. The philosophy of these cases is that the taxpayer's loss was not from the casualty but from his deliberate action in not seeking to recover from the insurance company when in fact the loss was "compensated" for by insurance. In our view these cases have no bearing on the instant case. Insofar as any insurance reimbursement was involved in the instant case, petitioner took it and reduced his payments for medical expenses by that amount as being an insurance reimbursement. In the area of dependency exemptions and medical expense deductions there is no requirement that the person for whom the payments are made have no funds of his own from which such payments could be made. The question is whether the funds of the person for whom the medical payments were made were in fact used to reimburse the person who made the payments.

Respondent also argues that since petitioner was the sole heir of his mother and father, his expectancy upon their death was in the nature of reimbursement for the medical expenses he paid for them. Respondent cites no authority for this argument and, in our view, the argument is spurious. In the first place, petitioner may predecease his parents and, in the second place, his parents may change the provisions of their will up until the date of their death. An inheritance expectancy is only that and is not a reimbursement for something paid by a person for another unless there is some contractual or other enforceable agreement, which was not the situation in this case.

In our view, therefore, the questions here resolve themselves to whether petitioner had such ownership in the savings account with the Citizens Federal Savings & Loan in the names of "William H. Jewell and/or Ruth Baxter Jewell and/or William C. Jewell," and in the certificates of deposit in these same names, that the deposits to the accounts were subject to petitioner's own use and, therefore, constituted reimbursement to him for amounts paid out for his parents' expenses. Respondent makes much of the fact that in 1971 into the early part of 1972 petitioner did deposit certain checks of his parents to his own account. The record shows that he kept strict accounting of these deposits and prior to the beginning of his taxable year here involved had transferred all funds from such sources accumulated in his account to the savings accounts and certificates of deposit in the joint names of his parents and him. In any event, no such deposits of any kind were made into

petitioner's account in the year here involved and no funds accumulated in his account in prior years remained in his account at the beginning of the year here involved. Under these circumstances, if petitioner's name had not been on the joint accounts with his parents, it would follow under our prior holdings that he would be entitled to the claimed medical expense and dependency exemption deductions and to compute his tax as head of household. In our view, therefore, the resolution of the issue here is dependent on the State law as to petitioner's interest in the joint accounts he had with his parents.

If petitioner had a right to the funds in the joint accounts with his parents for his own unrestricted use, then in our view he would have been reimbursed for the medical expenses he paid for his parents. The interest that accumulated on these accounts and the deposits made into the accounts of his parents' social security and pension checks were well over half of the total support in 1972 and petitioner's fiscal year 1973 of each of his parents. Under section 213 petitioner is not entitled to a deduction for medical expenses of his parents unless he contributed over half of their support. If the current interest on the funds in the accounts and the deposits to the accounts during the year here involved could as a legal matter be withdrawn by petitioner for his own unrestricted use, petitioner would not be entitled to any medical expense deduction for his parents irrespective of whether petitioner could have withdrawn for his own use the principal in the accounts as of the beginning of the year.[3]

In our view, under the Indiana law neither the principal nor the current deposits in these accounts belonged to petitioner for his own use. The Indiana law is clear that where deposits are made by a person in a joint account of himself and another, the ownership of the funds depends upon the intent of the person whose funds are placed in the account. *Ogle v. Barker*, 224 Ind. 489, 68 N.E.2d 550 (1946); *Bulen v. Pendleton Banking Co.*, 118 Ind. App. 217, 78 N.E.2d 449 (1948); *In Re Estate of Fanning*, 263

---

[3]Apparently respondent, with respect to the interest accrued on the savings accounts and certificates of deposit, viewed the interest as being the property of the person whose money was deposited since the facts show that less than $600 of this interest was agreed by respondent to be the income of petitioner's mother and the balance of this interest the income of petitioner's father. The clear indication is that respondent did not consider any portion of this interest income to be taxable to petitioner.

Ind. 414, 333 N.E.2d 80 (1975). While these cases involve whether funds placed in a joint and survivorship account by a decedent are the property of the person named on the joint account with right of survivorship or should go to the executor, their import is clear that the ownership of the funds depends on the intent of the party who placed the funds in the joint account. In *Kraus v. Kraus*, 235 Ind. 325, 132 N.E.2d 608, 610–611 (1956), the court quoted with approval the statement in *Bulen v. Pendleton Banking Co., supra*, that in order for such a deposit to constitute a valid inter vivos gift—

there must be both an intention to give and a stripping of the donor of all dominion or control over the given thing and a change of title must be irrevocable. * * * The transfer must be so complete that, if the donor again attempts to assume control of the property, without the consent of the donee, he becomes liable as a trespasser. * * *

As was pointed out in *Bulen v. Pendleton Banking Co., supra*, as well as *In Re Estate of Fanning, supra*, where a deposit is made in a joint account the person making the deposit can, during his lifetime, withdraw the amount or remove the name of the coowner from the account. In *In Re Estate of Fanning*, the court stated as follows in this respect (333 N.E.2d at 84):

Wildus Fanning's purchase of the certificates in the form presented here was a gift *in praesenti* of a contingent contractual right. *Hibbard v. Hibbard* (1947), 118 Ind. App. 292, 73 N.E.2d 181. This contingent contractual right could have been extinguished during the lifetime of Wildus Fanning. Wildus Fanning could have extinguished the contingent contractual right by requesting the bank to change the donee-beneficiary or by expressing a contrary intent. * * * [Fn. ref. omitted.]

Since these cases involved the rights of the person on the joint account after the death of the person whose funds were put into the account, the discussion therein of intent deals to an appreciable extent with whether the intent was that the individual have the funds for his own use after the death of the person depositing the funds. However, the inference from these cases is clear that the intention to create a contingent contractual right for the benefit of a third party is distinguished from the creating of a present unconditional right. See *Robison v. Fickle*, Ind. App. , 340 N.E.2d 824 (1976). In discussing the contingent right to the funds in a joint account of the survivor, the Indiana courts make it clear that this right is to be

distinguished from a present unconditional interest in the funds of a person other than the person depositing the funds.

In our view, in the present case the evidence shows that it was not the intent of petitioner's parents that he have any current ownership rights in the funds in the joint accounts. Petitioner's father expressed concern to petitioner over his inability to pay his and his wife's full expenses from current income. At petitioner's suggestion, petitioner began to pay his parent's medical expenses. A concern over living until all his funds were used is contrary to an intent to make a current gift of funds. Also, the fact that the account had been joint with petitioner since 1956 with the passbook in petitioner's father's possession until he went to the nursing home negates any intent to make a present transfer of funds to petitioner for his own use. In fact the evidence as a whole clearly negates any such intent.

On the basis of this record we conclude that petitioner was not reimbursed for the medical expenses he paid on behalf of his parents. We see no reason why the deduction should be denied to petitioner merely because when it became necessary from his view and that of his parents that he defray part of his parents' expenses he chose to pay the medical expenses of his parents because of these expenses being tax deductible.

*Decision will be entered for the petitioner.*