*405
 
 Opinion
 

 KLEIN, P. J.
 

 Northern California Power Agency (NCPA) appeals from a judgment dismissing the third party claim of NCPA to the proceeds of certain attachments levied against Resource Funding, Ltd. (RFL) by Ronald H. Askew (Askew).
 
 [1]
 

 On February 14, 1977, Askew filed an action against RFL to enforce payment of a promissory note in the amount of $47,000 given to Askew by RFL in return for a loan, plus interest thereon, attorneys’ fees and costs. A writ of attachment was issued and levies were made against a “regular” bank account of RFL and an account entitled the “NCPA-RFL Project Account.”
 

 On April 20, 1977, NCPA filed a third party claim pursuant to Code of Civil Procedure section 689 for the purpose of establishing its ownership of the NCPA-RFL Project Account. On August 2, 1977, following a hearing on the matter, judgment was entered dismissing NCPA’s third party claim.
 

 NCPA is a joint powers agency created under Government Code section 6500 et seq., consisting of the cities of Alameda, Biggs, Gridley, Healdsburg, Lodi, Lompoc, Palo Alto, Redding, Roseville, Santa Clara and Ukiah. The purpose is to exercise the common powers of the cities to obtain additional sources of electric power for their distribution systems. RFL is a corporation engaged in the business of developing geothermal steam projects.
 

 NCPA and RFL entered into an agreement dated April 13, 1976, entitled “Geothermal Steam Development and Purchase Agreement” (hereinafter Agreement), for the development of geothermal steam on certain lands under leases to be acquired by RFL. The complex, long range, 37-page Agreement contemplates the exploration for, and development of, geothermal steam, the building of power plants and access roads, and additional acquisition of acreage. It contains a six-page amendment, is supplemented by a letter, and involves various other documents.
 

 
 *406
 
 The Agreement refers to a “lease acquisition escrow” through which RFL was to acquire the desired leaseholds. “Closing” under the Agreement was termed the “Close of Escrow,” and was to occur concurrently with and be conditioned on the close of the lease acquisition escrow. At the “Close of Escrow,” RFL was to convey to NCPA the exclusive right to geothermal steam on 1,425 acres under lease to RFL, in consideration of NCPA’s making an initial payment to RFL of $930,000.
 

 Certain escrow instructions provided that the $930,000 was to be delivered to RFL in the following manner:
 

 First, $837,500 was to be deposited in “Account No. 2173-4, at the Bank of America, N.T. & S.A., Burbank Main Office, . . . being the NCPA-RFL Project Account.” Next, all escrow charges and title insurance premiums were to be paid. Lastly, the remainder was to be delivered to RFL.
 

 The Agreement itself contains a section entitled “Financing,” wherein the funds from the NCPA-RFL Project Account are expressly budgeted for specific purposes (with the proviso that the parties to the Agreement may agree otherwise). The budget allocates the entire $837,500 from the NCPA-RFL Project Account as follows: studies, $40,000; government clearance costs, $20,000; drilling of exploratoiy well, $500,000; organization and legal expenses, $15,000; management, administration and accounting, $162,500; contingency and miscellaneous, $100,000. In addition, it is provided in the Agreement that the signatures of representatives of both NCPA and RFL are required for withdrawals from the NCPA-RFL Project Account.
 

 Management of the project contemplated by the Agreement is provided for therein through the creation of an exploration and development program committee (EDP Committee), consisting of five members, three appointed by NCPA, two by RFL. The EDP Committee has authority to budget and approve expenditures from the NCPA-RFL Project Account.
 

 It was during the period between the April 13, 1976, date of the Agreement and the October 14, 1976, closing date of escrow that Askew advanced the loan to RFL, namely on June 2, 1976.
 

 The trial court, in dismissing NCPA’s third party claim, found that RFL “owned” the funds in the NCPA-RFL Project Account, that no trust had been established, and that it would be “inequitable” to allow the
 
 *407
 
 possibility of a veto by the EDP Committee to defeat Askew’s attachment.
 

 On appeal, NCPA contends that it had exclusive control of the funds in the NCPA-RFL Project Account so as to defeat an attachment by a creditor of RFL, and that the defeat of Askew as a creditor would not be inequitable.
 

 In resolving the issues created by the fact situation before us, we logically consider the applicability of the law of trusts. Contrary to the trial court’s determination, we believe that a trust relationship was created here.
 

 Generally speaking, a trust is a legal device whereby one person deals with property for the benefit of another. (Bogert, The Law of Trusts and Trustees (2d ed. 1965) § 1, p. 1.) Here, although RFL agreed to hold title to the NCPA-RFL Project Account, the funds therein were to be managed by the EDP Committee for the purpose of seeking out and providing steam for NCPA.
 

 A trust contemplates a fiduciary relationship with respect to property, wherein the person holding title is held to an equitable obligation to deal with or use the property for the benefit of another. (Bogert,
 
 supra,
 
 at pp. 1-3; Rest.2d Trusts, § 2.) The legal relationship results from a manifestation of an intent to create a trust, and the relationship is thereafter classified by the nature of that intent. In the case of express and resulting trusts, the intent is either expressed or inferred. (Bogert,
 
 supra,
 
 at p. 7.)
 

 However, we do not deem it necessary to dwell on the precise nature of the trust created by the Agreement, although NCPA urges that it is a resulting trust. That issue is not directly before us for decision. It is sufficient for us to recognize that all the indicia of a trust relationship appear from an examination of the Agreement.
 

 Clearly, a fiduciary relationship existed with respect to the NCPA-RFL Project Account subjecting RFL, despite its title ownership of the account, to an equitable duty to deal with the funds in the account for the benefit of NCPA. Under the Agreement, RFL is to pay all costs of the exploration and development project and other expenses incurred, but only in accordance with the terms of the budget as expressly set forth in the Agreement (unless both parties to the Agreement decide otherwise).
 

 
 *408
 
 We observe that reasonable business practices dictated that NCPA and RFL should pool their resources. NCPA sought additional sources of electric power for its distribution system; it had some funding available for such a project, but lacked expertise. RFL, on the other hand, had expertise in the development of geothermal steam projects, but apparently lacked capital. By working together in a fiduciary relationship, their mutual needs and goals seemed attainable, and thus the Agreement came into being.
 

 Analyzing the Agreement, we note that it not only contemplates that every penny of the NCPA-RFL Project Account is to be spent on the exploration and development project, but specifically delineates how and on what the entire amount is to be spent Further safeguards and restrictions on the use of the funds in the NCPA-RFL Project Account exist in the Agreement by virtue of the creation of the EDP Committee, expressly charged with overseeing and approving expenditures from the budgeted monies. The EDP Committee can only act through a vote of a majority of its members, made up of three representatives from NCPA and two from RFL.
 

 Another indication that a trust relationship was created in the NCPA-RFL Project Account is the provision found in the Agreement that the signatures of representatives of both NCPA and RFL are required for withdrawal from the account. In fact the bank cards for the account disclose that signatures of the president of RFL and the controller of NCPA are necessary for withdrawal.
 

 We thus conclude that the language of the Agreement makes it clear that the transferor, NCPA, did not intend the transferee, RFL, to have the beneficial interest in the property transferred, i.e., the $837,500, much less the “ownership” thereof. Seemingly, it would be difficult to draw a document with terminology more manifest as to the purpose of the funds in question than the Agreement before us.
 

 It may be that the title of the Agreement, “Geothermal Steam Development and
 
 Purchase
 
 Agreement” (italics ours), is somewhat ambiguous and invites misinterpretation. Any such ambiguity, however, can be readily clarified by a careful reading of the Agreement. What NCPA “purchased” was the exclusive
 
 right
 
 to purchase steam from RFL,
 
 *409
 
 if indeed any steam was found as a result of the exploration and development project. The funds in the NCPA-RFL Project Account were to be used exclusively for the exploration for and the development of geothermal steam, the largest amount budgeted, $500,000, being set aside for the drilling of an
 
 exploratory
 
 well. Neither representatives of RFL nor NCPA had access to the NCPA-RFL Project Account for any other purpose.
 

 Of course it goes without saying that no greater access to the funds was conferred on Askew by virtue of his being a creditor of RFL. By his attachment, Askew acquired no greater rights than RFL actually had.
 
 (Kinnison
 
 v.
 
 Guaranty Liquidating Corp.
 
 (1941) 18 Cal.2d 256, 263 [115 P.2d 450];
 
 Commercial & Farmers Nat. Bk.
 
 v.
 
 Hetrick, supra,
 
 64 Cal.App.3d 158, 164.)
 

 We turn now to the issue of whether it would be inequitable to disallow Askew’s levy since the monies RFL borrowed from Askew were spent, as the trial court said, “in substantial compliance with the intent of the agreement.” We conclude that to find any such inequity would be to ignore the detailed provisions of the Agreement and to frustrate the intent of the parties thereto, NCPA and RFL, as clearly manifested therein.
 

 Speaking in terms of equities, it would appear that Askew, at the time of his loan to RFL, knew of the Agreement, including the explicit provision therein for “Closing.” On the other hand, NCPA apparently did not know about the Askew loan and the promissory note when the loan transaction occurred.
 

 We are aware that the trial court found that up to $44,000 of the loan proceeds were spent in a manner consistent with the budgetary categories contemplated by the Agreement, the $44,000 sum comprising attorneys’ fees, travel, overhead and general operations and consultant fees. But whether or not the Askew loan was, as the trial court determined, instrumental in allowing RFL to “get its end of the project started promptly” in order to meet the “energy shortage,” the fact remains that the exploration and development project had not yet commenced as of the time of the loan since the lease acquisition escrow had not closed. It is not contemplated in the Agreement that RFL start the project on its own, or any phase thereof.
 

 
 *410
 
 Further, while the Agreement’s budget did make general provision for the items upon which RFL expended the Askew loan funds, it did so in different amounts than RFL actually spent.
 
 [2]
 

 In view of the foregoing, the judgment dismissing NCPA’s third party claim is reversed.
 

 Allport, J., and Potter, J., concurred.
 

 A petition for a rehearing was denied April 4, 1979.
 

 [1]
 

 A judgment dismissing a third party claim in a proceeding under Code of Civil Procedure section 689 is appealable as a final judgment in a special proceeding. (Code Civ. Proc., § 904.1;
 
 Commercial & Farmers Nat. Bk.
 
 v.
 
 Hetrick
 
 (1976) 64 Cal.App.3d 158, 162, fn. 2 [134 Cal.Rptr. 285].)
 

 [2]
 

 For example, although the Agreement’s budget provides for legal expenses of $15,000, RFL spent $32,000, of the Askew loan proceeds to pay attorneys’ fees.