T.C. Memo. 2000-360

UNITED STATES TAX COURT

GABRIEL M. DAYA, ET AL.[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  9061-98, 9062-98    Filed November 22, 2000.
             1976-99.

<u>William E. Taggart, Jr.</u>, for petitioners.

<u>H. Clifton Bonney, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DEAN, <u>Special Trial Judge</u>:  Respondent determined the
following deficiencies in and accuracy-related penalties to be
added to petitioners' Federal income taxes:

    [1] Cases of the following petitioners are consolidated
herewith:  Morhaf M. Daya, docket No. 9062-98; and Gabriel M.
Daya, docket No. 1976-99.

Gabriel Mahmoud Daya (Gabriel), docket Nos. 9061-98 and 1976-99:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1995 | $1,620 | $324 |
| 1996 | 1,515 | 303 |

Morhaf Michael Daya (Morhaf), docket No. 9062-98:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1995 | $1,312 | $262 |

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The cases have been consolidated for purposes of trial, briefing, and opinion.

The issues for decision are:

1. Whether Gabriel is entitled to dependency exemption deductions for his father in taxable years 1995 and 1996. We hold that he is not.

2. Whether Gabriel is entitled to head of household filing status in taxable years 1995 and 1996. We hold that he is not.

3. Whether Morhaf is entitled to head of household filing status in taxable year 1995. We hold that he is not.

4. Whether Gabriel is entitled to claim mortgage interest deductions in taxable years 1995 and 1996 in excess of that allowed by respondent. We hold that he is not.

5. Whether Morhaf is entitled to a mortgage interest deduction in taxable year 1995. We hold that he is not.

6. Whether Gabriel is entitled to property tax deductions in taxable years 1995 and 1996 in excess of those allowed by respondent. We hold that he is not.

7. Whether Morhaf is entitled to a property tax deduction in taxable year 1995. We hold that he is not.

8. Whether the underpayment of tax required to be shown on Gabriel's 1995 and 1996 Federal income tax returns is due to negligence or to disregard of rules or regulations. We hold that it is.

9. Whether the underpayment of tax required to be shown on Morhaf's 1995 Federal income tax return is due to negligence or disregard of rules or regulations. We hold that it is.

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference.

FINDINGS OF FACT

At the time petitions were filed for his 1995 and 1996 taxable years, Gabriel resided in Fremont, California. At the time the petition was filed for his 1995 taxable year, Morhaf resided in Foster City, California.

Petitioners are brothers who in August of 1983 emigrated from Syria to the United States with their family (the Mahmoud Daya family). Members of the Mahmoud Daya Family include petitioners' father, Mahmoud Gabriel Daya (Mahmoud), petitioners' mother, Laila

C. Daya (Laila), and petitioners' younger brother, Mayar Daya (Mayar).  Before moving to the United States, Mahmoud, together with his identical twin brother, Fuad Daya (Fuad), purchased a single family residence located at 913 Laguna Circle, Foster City, California (Foster City residence).

Fuad, who immigrated to the United States in 1953, had arranged for the purchase of the Foster City residence so that his brother's family would have a place to live when they arrived in the United States.  In addition to money contributed by both Mahmoud and Fuad, the acquisition of the Foster City residence was financed with a loan secured by a mortgage in Mahmoud and Fuad's names from the Bank of America.  Title to the Foster City residence was conveyed by a grant deed executed on April 18, 1983, and recorded on April 25, 1983, to:

> Mahmoud G. Daya, a married man, as his sole and
> separate property
> Fuad G. Daya, a married man, as his sole and separate
> property

The Mahmoud Daya family, including both petitioners, resided at the Foster City residence from the time of their arrival in the United States in 1983 through December 31, 1996.  By November 21, 1989, Gabriel, Morhaf, Mahmoud, and Laila had all become citizens of the United States.

Petitioners did not hold legal title to the Foster City residence at anytime during 1995.  On or about March 20, 1996, a "gift deed" was executed evidencing the transfer of legal title to

an undivided one-fifth interest in Mahmoud's undivided one-half interest in the Foster City residence from Mahmoud to Gabriel and Morhaf. This gift deed was recorded on March 21, 1996. On January 17, 1997, a series of four grant deeds effecting the consolidation of title to the Foster City residence in Mahmoud and Laila, as joint tenants, was recorded.[2] Mahmoud and Laila then executed a grant deed on January 24, 1997, and recorded the deed on June 25, 1997, evidencing the transfer of title to the Foster City residence to Mahmoud, Laila, Gabriel, and Morhaf "All As Their Interest May Appear".

Mahmoud and his brother Fuad were involved in business together under the corporate name Daya International Commerce and purchased a restaurant in San Francisco in 1987. In 1989, they sold the restaurant and accepted a note from the group that purchased the restaurant as payment. Later that year the building was destroyed by an earthquake. The buyers of the restaurant defaulted on the note. Mahmoud and Fuad attempted to collect on the note, but the buyers filed for bankruptcy. As a result of the default, Mahmoud and Fuad were liable for approximately a quarter of a million dollars on a note to the previous owner of the restaurant. Fuad paid the entire obligation, and Mahmoud

---

[2] One grant deed transferred Gabriel's interest, one transferred Morhaf's, one transferred Fuad and his wife, Martha's, and one transferred Mahmoud's interest.

transferred his half ownership of a building in San Francisco to Fuad as partial payment for his obligation on the note.

The financial disaster devastated Mahmoud, and he became severely depressed. He also developed diabetes. He was under medical care for both his diabetes and depression, and he was unable to work. At some point, Mahmoud became eligible for supplemental income payments (SSI) from the Social Security Administration on account of his disability. Mahmoud received SSI of $6,672 in 1995 and $7,517 in 1996. Neither Mahmoud nor Laila filed a Federal income tax return for taxable years 1990 through 1996. On August 5, 1999, just over a month before trial, Mahmoud died.

Fuad helped support the Mahmoud Daya family after Mahmoud became disabled. Later, when Gabriel and Morhaf obtained full-time employment, they helped support their family. The financial support available to the Mahmoud Daya family during the years in issue consisted of Mahmoud's SSI, Fuad's contributions to the family, and a portion of Gabriel and Morhaf's income.

In 1995 Gabriel was employed by Sbarro, Inc. and Taco Bell Corporation and earned $19,115 in wages, net of deductions and withholdings. In 1996 Gabriel was employed by Sbarro, Inc. and earned $18,871 in wages, net of deductions and withholdings. In 1995 and 1996, Morhaf was employed by Nordstrom Incorporated

(Nordstrom) and earned $21,340 and $29,450 in wages, net of deductions and withholdings, in the respective years.

During 1995 and 1996, the Mahmoud Daya family maintained three checking accounts at Bank of America and one checking account at Glendale Federal Bank. Gabriel maintained Bank of America account No. 04879-09049 (Gabriel's checking account) as his personal checking account. Morhaf maintained Bank of America account No. 00407-06172 (Morhaf's checking account) as his personal checking account. Glendale Federal Bank account No. 558-703707-2 (household checking account) was maintained as an account for the payment of the Mahmoud Daya family's household expenses. Mahmoud and Laila maintained Bank of America account No. 02810-05978 (Mahmoud and Laila's checking account) as their personal checking account.

Mahmoud also had unrestricted access to Glendale Federal Bank checking account No. 558-703483-1 (Fuad's Glendale Federal account) that Fuad opened for Mahmoud to use. Although the account was in Fuad's name and contained Fuad's money, Mahmoud had the ability to withdraw money from the account at any time for any purpose.

Gabriel established the household checking account as a means for Laila to pay household expenses. The account was held in his name, and Laila was a signatory named as attorney in fact. Gabriel, Morhaf, and Fuad all contributed money to the household

checking account in 1995 and 1996.  Deposits and interest paid into the account totaled $32,531.88 in 1995 and $24,502.34 in 1996.  Disbursements from the account totaled $35,513.83 in 1995 and $24,480.82 in 1996.

Of the $35,513.83 disbursed from the household checking account in 1995, Gabriel identified the source of $4,919.31 as his paycheck deposits or otherwise attributable to him.[3]  Also deposited into the account in 1995 were two checks payable to Mahmoud from Fuad totaling $17,500, a $1,000 check payable to Gabriel from Fuad, and a $3,000 check drawn on a Bank of America Customline account secured by the Foster City residence.  Interest accrued on and paid into the household checking account in 1995 totaled $37.02.  The specific source of $9,057.50 of the funds disbursed from the household account in 1995 has not been identified.

Copies of 16 checks drawn on the account in 1995 are not available; however, most of the checks written on the account were signed by Laila.  The following is a summary of identifiable disbursements from the account:

---

[3] Gabriel testified that an $809.11 deposit made on Dec. 28, 1994, and an $813.64 deposit made on Jan. 9, 1995, into the household account were his paychecks.  He also testified that $42 of another deposit was from his funds.  These amounts, along with four other deposits of $813.64 each, represent the total amount of deposits made to the household account that we attribute to Gabriel.

| Payee | Amount |
|---|---|
| Ghassam Khalaf D.D.S. | $215.00 |
| Bank of Americard Visa | 1,754.36 |
| TCI Cablevision | 259.21 |
| Around the World | 160.00 |
| Hamaz Kayim | 50.00 |
| Morhaf Daya | 800.00 |
| Bank of America Customline account | [1]6,714.37 |
| Bank of America Loan #4540719 | [2]13,101.09 |
| Pacific Bell | 2,880.78 |
| P.G.& E. | 164.00 |
| Lee Buffington County Tax | 1,541.05 |
| Costco Wholesale | 32.61 |
| Fire Insurance Exchange | 931.00 |
| Farmers Insurance Exchange | 115.25 |
| DMV Renewal | 217.00 |
| Bank of America 5273029820505152 | 1,380.00 |
| Sanual Bank | 18.00 |
| Mayar Daya | 1,000.00 |
| Total | 31,333.72 |

[1] This amount includes check No. 180 in the amount of $605.56, which was not included in the "Schedule of Checks for 1995", but which we infer from the record to be a payment on the Bank of America Customline account.

[2] This amount includes check No. 178 in the amount of $1,060.10, which was not included in the "Schedule of Checks for 1995", but which we infer from the record to be a payment on Bank of America loan No. 4540719.

The record provides no additional information as to these disbursements. Petitioners offered no testimony regarding the nature of these expenditures, and offered copies of checks into evidence only to show the date, amount, and payee.[4]

---

[4] Petitioners objected to the introduction of the memo notations on the checks entered into evidence unless there was

Although Gabriel testified that he recognized some of the deposits into the household checking account in 1996, he failed to identify any such deposits or provide us with a means to determine which deposits were his paychecks. Checks totaling $2,600 payable to Gabriel written by Morhaf on Morhaf's checking account were deposited in 1996 into the household checking account.[5] The remaining deposits made into the account were from funds provided by Gabriel, Morhaf, and Fuad; petitioners, however, have provided no breakdown of the specific amounts attributable to each. The following are identifiable disbursements from the household account in 1996:

| Payee | Amount |
|---|---|
| Pacific Bell | $1,212.40 |
| Bank of America Loan #4540719 | [1]13,621.38 |
| Bank of America Customline account | [2]7,170.83 |
| Lee Buffington C.T.C. | 1,543.43 |
| John Zahar | 100.00 |
| Department of Parking, Traffic | 25.00 |
| Discover | 69.28 |
| Farmers Ins. GRP of COS | 420.00 |
| Econo Door | 54.50 |
| Michael Daya | 200.00 |
| Total | 24,416.82 |

[1] This amount includes check No. 264 in the amount of $1,107.99, which was not included in the "Schedule of Checks for 1996", but which we infer from the record was payment on Bank of America loan

specific testimony at trial from the individual who made the notation.

[5] Deposits in 1996 attributable to Morhaf's checks to Gabriel include $300 on Mar. 6, $300 on May 9, $500 on Jun. 14, $300 on Jul. 9, $300 on Aug. 16, $300 on Sept. 5, $300 on Oct. 9, and $300 on Dec. 6.

No. 4540719.

[2] This amount includes check No. 265 in the amount of $596.83, which was not included in the "Schedule of Checks for 1996", but which we infer from the record was payment on Bank of America Customline account.

Petitioners have provided no additional information as to the nature of these expenditures.

Gabriel's checking account was maintained for personal expenditures. He also made withdrawals from the account when extra money was required to maintain the Foster City residence. Deposits into the account in 1995 for which petitioners presented records totaled $6,017.07, and disbursements for which records were presented totaled $6,424.42.[6] Gabriel identified several of the deposits into the account in 1995 as his paychecks. The record provides no evidence as to the amount of any funds from Gabriel's checking account used to support his family in 1995. Most of the disbursements from the account were in the form of cash withdrawals. The record provides no information regarding Gabriel's checking account in 1996.

Morhaf's checking account primarily was used during 1995 to pay his personal expenses. He deposited no money directly into the household checking account in 1995, but he gave money to his

[6] Bank statements for Gabriel's checking account were admitted into evidence for the following periods: (1) Dec. 14, 1994, through Mar. 15, 1995; (2) May 13 through Aug. 15, 1995; and (3) Sept. 14 through Dec. 12, 1995.

mother to deposit into the household account and for groceries. Deposits into Morhaf's checking account from January 1 through December 5, 1995, totaled $29,888.63. Of this amount, $14,625.94 of the deposits can be identified as Morhaf's payroll checks from Nordstrom. In 1995, Morhaf deposited a $3,765 check from Fuad's Glendale Federal account written and signed by Mahmoud into his checking account. The sources of other deposits into Morhaf's checking account include unidentified Nordstrom paychecks and funds repaid to Morhaf by friends and family for whom Morhaf had purchased items using his credit and discount as an employee of Nordstrom. Disbursements from Morhaf's checking account in 1995 totaled $26,119.81. Of this amount, $1,776.13 was disbursed for expenditures classified as "Utilities (Pacific Bell, etc.)", $668.74 was disbursed for "Household (Safeway, Lucky, etc.)", $1,096.07 was disbursed for "Transportation (Automobile)", and $131 was disbursed for "Medical & Dental".[7]

The sole evidence regarding Morhaf's checking account in 1996 is a summary of 14 checks drawn on the account and copies of the checks. These checks represent at least some of Morhaf's

---

[7] These amounts are drawn from a "Summary of Account Disbursements" and copies of checks. The summary was prepared from bank statements covering periods from Dec. 7, 1994, through Dec. 5, 1995. Although we are unable to ascertain which payments are included under the various categories in the summary, respondent has not reserved any objections to this summary. We thus accept the summary as fact. Because the summary covers part of 1994, we have, however, deducted payments made to Pacific Bell in 1994 from the total listed under "Utilities" in the summary.

contributions to his family.[8]  Checks payable to Gabriel total

$3,500.  There is also a check payable to "Dad's Visa" for $200,

and two checks payable to Lee Buffington for property taxes on the

Foster City residence totaling $3,121.16.

Mahmoud's SSI was deposited regularly into Mahmoud and

Laila's checking account.  The total amount deposited into Mahmoud

and Laila's checking account in 1995 for which petitioners

presented records is $6,112.56.[9]  The total amount disbursed from

the account in 1995 for which petitioners presented records is

$6,582.37.[10]  The following is a summary of identifiable

disbursements from Mahmoud and Laila's account in 1995:

---

[8] Morhaf testified that the checks represent "My participation in the house.  I mean, whatever we're short, whatever, we put in."

[9] The record includes bank statements from Mahmoud and Laila's checking account beginning Jan. 31, 1995, and ending on Dec. 28, 1995.

[10] A "Schedule of Checks for 1995" reflects checks written from Dec. 26, 1994, through Dec. 29, 1995, with only 1 check (No. 2422) unaccounted for.

| Payee | Amount |
|---|---|
| P.G. & E. | $2,041.44 |
| Father Gregory Ofresh | 100.00 |
| Bank of America Customline account | 583.26 |
| Farmer Insurance Exchange | 257.55 |
| Tom Kohara | 350.00 |
| Syrian American Association | 50.00 |
| Estero Utility Services | 457.30 |
| Pacific Bell | 889.50 |
| B.F.I. | 123.84 |
| Mayar Daya | 150.00 |
| Morhaf Daya (or Michael Daya) | 542.00 |
| T.C.I. | 175.14 |
| AAA | 60.00 |
| Post Master "Stamp" | 32.00 |
| City of Foster City | 120.34 |
| Total | 5,932.37 |

The record contains no additional information regarding these expenditures. Petitioners presented no evidence regarding Mahmoud and Laila's checking account in 1996.

Fuad provided money to the Mahmoud Daya family in 1995 and 1996. He did not expect to be reimbursed. In addition to Fuad's two checks totaling $17,500 payable to Mahmoud and his $1,000 check payable to Gabriel, Fuad provided additional funds to the family in 1995. Mahmoud wrote and signed two checks on Fuad's Glendale Federal account: A $3,765 check payable to Morhaf and a $1,543 check payable to Lee Buffington for property taxes on the Foster City residence. Fuad's contributions in 1996 consisted of at least one check payable to Gabriel for $1,000.

There were two outstanding loans in the names of Mahmoud and Fuad secured by deeds of trust on the Foster City residence in 1995 and 1996: Bank of America loan No. 4540719 (mortgage) and

Bank of America Customline account No. 1537948839 (home equity line of credit), which was changed to account No. 02500211814947041 in July 1995. Interest was incurred on the two loans in the amounts of $18,606 in 1995 and $18,378 in 1996. Petitioners did not assume a legal obligation on Mahmoud's and Fuad's indebtedness in 1995 or 1996.

Payments made by the Mahmoud Daya family on the home equity line of credit in 1995 totaled $7,297.63, with $6,714.37 of the total paid from the household account and $583.26 paid from Mahmoud and Laila's checking account. Payments made by the Mahmoud Daya family on the mortgage in 1995 totaled $13,101.09 and were made with checks from the household account.

The Mahmoud Daya family made payments on the home equity line of credit in 1996 with checks drawn from the household account totaling $7,170.83. Payments were made on the mortgage in 1996 with checks from the household account totaling $13,621.38.

California real property tax statements for the Foster City residence were in the names of Mahmoud and Fuad in both 1995 and 1996. Real property taxes of $3,082 were assessed against the residence for the fiscal year ending (FYE) June 30, 1995. The tax liability was due in two equal installments. The first installment was due on or before November 1, 1994, with a 10-percent penalty for payments after December 10, 1994, and the second installment was due on or before February 1, 1995, with a

10-percent penalty plus $10 cost for payments after April 10, 1995.  Laila made a payment of $1,541.05 for property taxes with a check from the household checking account dated March 23, 1995.

The real property tax liabilities on the Foster City residence for the 2 subsequent fiscal years were each due in two equal installments under the same terms as the property tax for the preceding year.  For FYE June 30, 1996, the real property taxes assessed against the Foster City residence were $3,086. Mahmoud made a payment of $1,543.43 with a check dated December 2, 1995, drawn on Fuad's Glendale Federal bank account and signed by Mahmoud.  Laila made a payment of $1,543.43 with a check from the household account dated March 20, 1996.  For FYE June 30, 1997, the real property taxes assessed against the Foster City residence were $3,122.  The property taxes were paid with checks from Morhaf's personal checking account dated December 1, 1996, and December 29, 1996, in the amount of $1,560.58 each.

On his 1995 and 1996 Federal income tax returns, Gabriel claimed his father as a dependent and head of household filing status.  Gabriel also claimed deductions of $9,303 and $9,189 for home mortgage interest and deductions of $1,532 and $1,543 for property taxes in 1995 and 1996, respectively.

On his 1995 Federal income tax return, Morhaf claimed his mother as a dependent and head of household filing status.  He

also claimed a mortgage interest deduction of $9,303 and a property tax deduction of $1,532.

In notices of deficiency, respondent determined Gabriel was not entitled to dependency exemption deductions for Mahmoud and to head of household filing status for tax years 1995 and 1996. Respondent further determined Gabriel was not entitled to deductions for home mortgage interest expense and for property tax expense in 1995. Respondent disallowed all but 5 percent of Gabriel's deductions for home mortgage interest expense and for property tax expense in 1996. As a result of respondent's adjustments, Gabriel's itemized deductions for each of the years in issue were reduced to amounts less than the allowable standard deduction. Gabriel's tax liability, therefore, was determined using the standard deduction for each of the years in issue.

Respondent determined Morhaf was not entitled to head of household filing status and to deductions for mortgage interest expense and property tax expense in taxable year 1995. Respondent's determination reduced Morhaf's itemized deductions to an amount less than the standard deduction in 1995; thus, Morhaf's tax liability was determined using the standard deduction.

OPINION

Deductions are strictly a matter of legislative grace, and taxpayers must satisfy the specific requirements for any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84

(1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934). Taxpayers are required to maintain records sufficient to substantiate their claimed deductions. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Petitioners bear the burden of showing error in respondent's determinations contained in the notice of deficiency.[11] See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

<u>Dependency Exemption Deductions</u>

The first issue for decision is whether Gabriel is entitled to dependency exemption deductions for his father for tax years 1995 and 1996. Section 151(c)(1) allows a taxpayer to claim an exemption for each qualifying dependent. A taxpayer's father or mother whose gross income for the calendar year is less than the exemption amount is considered the taxpayer's dependent if the taxpayer provides more than half the father or mother's support for the calendar year. See secs. 151(c)(1)(A), 152(a). Respondent does not dispute that Mahmoud's gross income was less than the exemption amount, but contends that Gabriel did not

---

[11] The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 685, 724-727, added sec. 7491, which shifts the burden of proof to the Secretary in certain circumstances. Sec. 7491, however, is applicable to court proceedings arising in connection with examinations commencing after July 22, 1998. Petitioners do not contend, nor does the record show, that their examinations commenced after July 22, 1998, or that sec. 7491 is applicable to them.

provide more than half his father's support in 1995 and 1996.

Petitioners suggest Federal tax law does not require taxpayers to show that expenditures of support were paid from specific sources. They argue that they contributed all the funds that went into the household account, that most of the expenses of supporting the Mahmoud Daya family were paid with funds from the household account, and that neither Federal income tax law nor logic prevents them from agreeing that Gabriel's contributions toward the support of the family be considered to be made on behalf of his father and that Morhaf's contributions be considered on behalf of his mother.[12] We disagree with petitioners' interpretation of both the facts and the law.

To qualify for dependency exemption deductions, a taxpayer must establish the total support costs expended on behalf of a claimed dependent from all sources for the year, and the taxpayer must demonstrate that he provided over half of this amount. See Archer v. Commissioner, 73 T.C. 963, 967 (1980); Turecamo v. Commissioner, 554 F.2d 564, 569 (2d Cir. 1977), affg. 64 T.C. 720 (1975); Blanco v. Commissioner, 56 T.C. 512, 514-515 (1971); sec. 1.152-1(a)(2)(i), Income Tax Regs. If the amount of total support is not established and cannot be reasonably inferred from

---

[12] We note that neither Morhaf or Fuad filed a written declaration that he would not claim Mahmoud as a dependent in 1995 or 1996 in accordance with sec. 152(c)(4) such that we should consider whether Gabriel could be treated as having provided over half of Mahmoud's support under the provisions of sec. 152(c), Multiple Support Agreements.

competent evidence available to the Court, it is not possible to conclude that the taxpayer claiming the exemption provided more than one-half of the support of the claimed dependent. See Blanco v. Commissioner, supra.

The claimed dependent's contributions toward his or her own support are part of the total support computation and include "income which is ordinarily excludable from gross income, such as benefits received under the Social Security Act." Sec. 1.152-(1)(a)(2)(ii), Income Tax Regs. Only the amount of such income actually spent on the individual's support is considered in determining support for purposes of the dependency exemption. See Carter v. Commissioner, 55 T.C. 109 (1970).

"The term 'support' includes food, shelter, clothing, medical and dental care, education, and the like." Sec. 1.152-1(a)(2)(i), Income Tax Regs. Although the amount of an item of support is usually its cost, where lodging is furnished to an individual, the amount of support is the fair market value of such lodging. See id.

If several members of a household contribute toward expenses which are equally applicable to the support of each member of the household and there is no evidence of actual support for individual members of a household, the contributing members are presumed to have pooled their contributions to support the household, and each member of the household is considered to have

received an equal part of the contributions as part of his support.  See De La Garza v. Commissioner, 46 T.C. 446 (1966), affd. per curiam 378 F.2d 32 (5th Cir. 1967).  Similarly, when an individual outside the household not sharing in the common fund contributes funds to the support of the household, that individual's contributions are allocated equally to each member of the household.  See Cogan v. Commissioner, T.C. Memo. 1971-251.  Any "amount contributed to a common family fund by a particular member of the household is deemed to have been supplied in full for his support when such amount is less than his aliquot share of the entire fund."  De La Garza v. Commissioner, supra at 449.

On brief petitioners state that sums from various bank accounts can be identified as payments for items constituting expenditures for support within the meaning set forth in section 1.152-1(a)(2)(i), Income Tax Regs.  Petitioners, however, have not identified those payments which they believe constitute support, and we are unable to determine how they computed their support figures, except that it is clear they included mortgage interest and personal property tax payments on the Foster City residence in their calculations.

Gabriel has failed to establish the total amount expended on Mahmoud's support from all sources in 1995 and 1996.  He likewise has failed to establish his own contributions toward his father's support.  Gabriel's only testimony regarding support he provided

to his father was that his mother used funds from the household checking account to purchase food for the family and to pay household expenses. The record does include copies of checks drawn from the various accounts which provide some evidence of support expenditures. Aside, however, from a summary of disbursements from Morhaf's checking account in 1995, petitioners have provided us with no evidence of the nature of the expenditures beyond what we are able to infer from the record and the name of the payee on the checks.

From the evidence presented at trial, we are able to identify a total of $11,095.15 as 1995 expenditures for the support of the Mahmoud Daya family within the meaning set forth in section 1.152-1(a)(2)(i), Income Tax Regs. The total amount of identified support expenditures in 1995 includes: (1) $3,735.99 from the household checking account; (2) $3,671.94 from Morhaf's checking account; and (3) $3,687.22 from Mahmoud and Laila's checking account. The following is a summary of the expenditures from each of these accounts which we have identified as constituting support:

### Household Checking Account

| Payee | Amount |
| --- | --- |
| Ghassam Khalar D.D.S. | $215.00 |
| TCI Cablevision | 259.21 |
| Pacific Bell | 2,880.78 |
| P.G.&E. | 164.00 |
| DMV Renewal | 217.00 |
| Total | 3,735.99 |

<u>Morhaf's Checking Account</u>

| <u>Item</u> | <u>Amount</u> |
|------|--------|
| Utilities | $1,776.13 |
| Household | 668.74 |
| Transportation | 1,096.07 |
| Medical & Dental | <u>131.00</u> |
| Total | 3,671.94 |

<u>Mahmoud and Laila's Checking Account</u>

| <u>Payee</u> | <u>Amount</u> |
|------|--------|
| P.G.&E. | $2,041.44 |
| Estero Utility Services | 457.30 |
| Pacific Bell | 889.50 |
| B.F.I. | 123.84 |
| T.C.I. | <u>175.14</u> |
| Total | 3,687.22 |

The only expenditures we can identify as constituting support for the Mahmoud Daya family in 1996 within the meaning set forth in section 1.152-1(a)(2)(i), Income Tax Regs., are the payments from the household account to Pacific Bell totaling $1,212.40.

It is evident from the record that many items required to be included in the total support calculation are absent in both years. Petitioners have failed to provide any evidence of expenditures made for food or clothing. They also have not provided evidence of the fair rental value of the Foster City residence.

Petitioners rely on the mortgage interest and property tax payments made on the Foster City residence during the years at

issue to show the value of the Mahmoud Daya family's lodging.  The value of a claimed dependent's lodging must be included as part of his total support; it is well settled, however, that the proper measure for valuing lodging for purposes of determining support is the fair rental value of the premises allocable to the claimed dependent and not the actual mortgage payments and property taxes paid for maintaining the household.  See Pierce v. Commissioner, 66 T.C. 840, 849 (1976); Blarek v. Commissioner, 23 T.C. 1037, 1039 (1955); Keegan v. Commissioner, T.C. Memo. 1997-511; Pierce v. Commissioner, T.C. Memo. 1981-254; Gilliam v. Commissioner, T.C. Memo. 1969-188, affd. per curiam 429 F.2d 570 (4th Cir. 1970); Tourte v. Commissioner, T.C. Memo. 1969-143; Sumner v. Commissioner, T.C. Memo. 1969-156; Coary v. Commissioner, T.C. Memo. 1969-25; sec. 1.152-1(a)(2)(i), Income Tax Regs. Petitioners have not provided any evidence from which we could conclude that the mortgage payments and property taxes are in any way related to the fair rental value of the Foster City residence. See Coary v. Commissioner, supra.  Without evidence of the fair rental value of the residence, Gabriel cannot establish Mahmoud's total support.  See Sumner v. Commissioner, supra; Coary v. Commissioner, supra.

Petitioners assume they should be credited with supplying the Mahmoud Daya family's lodging during the years in issue, but it is the owner of the premises who is to be credited with providing the

lodging as support. See <u>Pierce v. Commissioner</u>, <u>supra</u>, 66 T.C. at 849-850; <u>Livingston v. Commissioner</u>, T.C. Memo. 1976-211. If the claimed dependent is the owner of the premises in which the taxpayer resides rent free, the sum of the taxpayer's contributions toward the support of the claimed dependent should be offset against the value of the lodging furnished to the taxpayer. See <u>Hahn v. Commissioner</u>, 22 T.C. 212, 215 (1954). To determine the value of the lodging provided to a claimed dependent, the fair rental value of lodging should be divided equally among the members of a household if all members of the household have free access to the entire home. See <u>Tourte v. Commissioner</u>, <u>supra</u>.

During 1995, Mahmoud and Fuad were the sole holders of legal title to the Foster City residence. The record does not provide any evidence from which we could conclude that Gabriel had equitable or beneficial ownership of the residence in 1995. See <u>infra</u>. Mahmoud, therefore, provided at least half of the fair rental value of the residence toward the support of his family in 1995.[13] See <u>Gilliam v. Commissioner</u>, 429 F.2d 570, 571 (4th Cir. 1970), affg. per curiam T.C. Memo. 1969-188; <u>Livingston v. Commissioner</u>, <u>supra</u>. Thus, not only is Mahmoud's contribution of

---

[13] Although we make no such finding, there is some evidence in the record suggesting that Fuad may have held bare legal title to the Foster City residence such that Mahmoud should be credited with full ownership of the residence. See <u>Trans v. Commissioner</u>, T.C. Memo. 1999-233; <u>Uslu v. Commissioner</u>, T.C. Memo. 1997-551; <u>Conroy v. Commissioner</u>, T.C. Memo. 1958-6.

lodging to himself considered in determining his total support for the year, but Gabriel must offset any support he provided to Mahmoud by the value of the lodging that Mahmoud provided him.

On March 20, 1996, Gabriel and Morhaf acquired title through a gift deed to an undivided 10-percent interest in the Foster City residence. Gabriel is considered to have provided 5 percent (half of the interest he shared with Morhaf) of the fair rental value of the residence for a portion of the year. Mahmoud, however, continued to have legal ownership of an undivided 45 percent of the Foster City residence in 1996 and therefore, as in 1995, provided the value of his own lodging for the year and a portion of his family's lodging, including Gabriel's.

Even if we were to ignore Mahmoud's contribution toward his own support and the support of his family in the form of the fair rental value of the Foster City residence and accept the actual cost of maintaining the Foster City residence (mortgage interest payments and property taxes) as the appropriate value of lodging to be included in the support computation, Gabriel still has not provided a sufficient basis for us to determine that he provided over half of Mahmoud's support during the years in issue.

Gabriel suggests it is unfair to place the burden upon him of proving he provided over half of Mahmoud's support when he and his brother contributed almost all of the money that supported the Mahmoud Daya family. But see Rivers v. Commissioner, 33 T.C. 935,

937 (1960)(finding that the taxpayer has the burden of establishing his right to dependency exemptions and that the Court is not authorized or required to conjecture as to the total amount expended on the support of a taxpayer's claimed dependent). The record, however, reflects that Mahmoud had significant potential sources of support other than Gabriel and Morhaf. See Terauds v. Commissioner, T.C. Memo. 1997-64 (finding taxpayer not entitled to dependency exemption for daughter because there was evidence daughter was receiving support from additional sources, and taxpayer did not establish daughter's total support for year).

Neither petitioners nor Fuad testified that the copies of checks drawn on Fuad's various bank accounts that are included in the record constituted his total contributions to the Mahmoud Daya family during the years at issue. Petitioners provided no evidence reflecting the total activity of Fuad's Glendale Federal bank account to which Mahmoud had full access during the years at issue. Fuad testified that he opened the Glendale Federal bank account in his name and gave Mahmoud signatory authority on the account so that Mahmoud could use the account for "his house". He further testified that the account was "very inconvenient" for him to use but that he opened the account at Glendale Federal Bank because it was within walking distance of the Foster City residence and convenient for Mahmoud. Petitioners offered no explanation as to why Fuad would go to the trouble to establish a

checking account specifically for Mahmoud's convenience if Mahmoud were only going to draw two checks on the account over the course of 2 years. The record also fails to establish the total activity in Fuad's other two accounts on which he wrote checks for the benefit of the Mahmoud Daya family.

In addition, the record provides no evidence regarding Mahmoud and Laila's checking account in 1996 and little evidence regarding Morhaf's checking account in 1996. Petitioners offered no explanation for their failure to produce evidence regarding these potential sources of Mahmoud's support. Their failure to introduce evidence that is within their control gives rise to a presumption that the evidence, if provided, would be unfavorable to them. See Cluck v. Commissioner, 105 T.C. 324, 338 (1995); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

The amount of money available for support reflected in the record does not support Gabriel's contention that he provided more than half of his father's support during the years in issue. Morhaf provided at least $3,671.94 for the support of the Mahmoud Daya family in 1995. Mahmoud received $6,672 in SSI and two checks from Fuad totaling $17,500 in 1995. Gabriel argues that the $17,500 should be considered support provided by him because the money was a gift to him and Morhaf from Fuad. He also argues that he should be credited with providing the $17,500 for the

support of Mahmoud in any case because the money was deposited into the household checking account.  We disagree with both arguments.

The two checks were payable to Mahmoud and have memo notations indicating that they are for "Perry's Settlement".  Fuad testified that the checks represent the amount to which Mahmoud would be entitled for the settlement of Daya International's legal dispute if Mahmoud had not owed Fuad money.  Fuad further explained: "I loan Mahmoud, to his family, so he can eat.  Because I loan him many other things."  When pressed for additional information, Fuad indicated the checks were a gift.  The record as a whole suggests that Fuad provided the $17,500 to Mahmoud to enable Mahmoud to provide for his family but that Mahmoud was under no obligation to spend the money in any particular manner or to repay Fuad.  Despite petitioners' contentions in their brief, nothing in the record indicates the money was a gift to Gabriel or Morhaf from Fuad.

The deposit of the $17,500 into the household checking account does not mean that the money should be attributed to Gabriel for determining his contributions to Mahmoud's support simply because Gabriel was the owner of the account.  The record does not suggest that Gabriel received the money from his father

as an outright and unconditional gift.[14]  See <u>Sheldon v.</u>
<u>Commissioner</u>, T.C. Memo. 1969-170.  The facts and circumstances do
not support a finding of donative intent on the part of Mahmoud.
See <u>In re Marriage of Jacobs</u>, 180 Cal. Rptr. 234 (Ct. App.
1982)(without donative intent, no gift has been made).  Gabriel's
own testimony indicates that the household account was established
to pay expenses of the Mahmoud Daya family and that Laila was
given signatory authority over the account so that she could pay
household expenses.  Gabriel had a separate checking account to
cover his personal expenditures.  In fact, all of the mortgage
payments on the Foster City residence in 1995 were made from the
household account, as were most of the payments on the home equity
line of credit and half of the property taxes due for the year.
By depositing the checks from Fuad in the household checking
account, Mahmoud pooled the $17,500 with Gabriel, Morhaf, and
Fuad's funds so that Laila would have funds at her disposal to
cover household expenses.  In our view the household account was a
"common family fund", and the contributing members should each be
credited with having pooled the amount of their individual
contributions.  See <u>De La Garza v. Commissioner</u>, 46 T.C. at 448-

---

[14] Even if Mahmoud did intend for Gabriel to have unrestricted use
of the $17,500, it could constitute reimbursement for any funds
expended by Gabriel on behalf of Mahmoud.  See <u>Jewell v.</u>
<u>Commissioner</u>, 69 T.C. 791, 801-802 (1978).

449.

Nothing in the record suggests that Mahmoud intended to transfer beneficial interest of the money to Gabriel.  See Lehmann v. Kamp, 77 Cal. Rptr. 910 (Ct. App. 1969).  Instead, the record supports a finding that the money was deposited into the household account for the limited purpose of paying household expenses.  Under these circumstances, Gabriel, as owner of that account, was acting as a trustee for the benefit of his family.

> A trust contemplates a fiduciary relationship with respect to property, wherein the person holding title is held to an equitable obligation to deal with or use the property for the benefit of another.  The legal relationship results from a manifestation of an intent to create a trust, and the relationship is thereafter classified by the nature of that intent.  [Askew v. Resource Funding, Ltd., 156 Cal. Rptr. 208, 210 (Ct. App. 1979) (citing Bogert, The Law of Trusts and Trustees, sec. 1, at 1-3 (2d ed. 1965)).]

Here, the intent to create a trust relationship, if not specifically expressed by the parties, can be inferred from the facts and circumstances surrounding their relationship and the nature of the household account.  See id. (distinguishing between express and resulting trust and finding it unnecessary to dwell on the precise nature of the trust where the indicia of a trust relationship are evident).  Thus, Gabriel was not the equitable owner of the money, and it should not be credited to him for purposes of determining his contributions to the support of Mahmoud.

Mahmoud also had access to Fuad's Glendale Federal account on which he wrote at least two checks in 1995. One of these checks was written to cover property taxes in the amount of $1,543.43 on the Foster City residence. The other check was made payable to Morhaf for $3,765 and may have been used to reimburse Morhaf for household expenses or to cover household expenses. Also, $3,000 advanced from the home equity line of credit in Mahmoud and Fuad's names was deposited into the household account in 1995. Thus, Mahmoud had available for his support in 1995 at least $32,480.43[15] attributable either to himself or to Fuad. In addition, Morhaf had wages, net of deductions and withholding, of $21,340, and at least $3,671.94 of this amount was expended on the support of the Mahmoud Daya family in 1995.

In 1995 Gabriel earned wages, net of deductions and withholding, of $19,115. His 1995 Federal income tax return lists other income totaling $516. Gabriel also received a $1,000 check from Fuad in 1995. Although Fuad's testimony suggests that all of his contributions to the members of the Mahmoud Daya family were made for the family's general support, it is not clear that Gabriel was under any obligation to use the funds in a particular manner. Thus, Gabriel had a total of $20,631 which he could have provided for the support of the Mahmoud Daya family in 1995.

---

[15] This amount includes Mahmoud's SSI of $6,672, Mahmoud's checks from Fuad totaling $17,500, the two checks totaling $5,308.43 Mahmoud drew on Fuad's Glendale Federal account, and $3,000 drawn on the home equity line of credit.

The record, however, reflects that Gabriel did not contribute all of his income toward the support of his family. Gabriel testified that he maintained his personal checking account primarily to cover personal expenses. Gabriel failed to produce bank records for his personal checking account for approximately 13 weeks in 1995. The records he did produce indicate that deposits into the account totaled $6,017.07. Gabriel testified that he recognized deposits into the account as deposits of paychecks and money. Nothing in the record indicates that Gabriel received funds from others to deposit into this account. Thus, no more than $14,613.93 of the deposits into the household checking account in 1995 could be attributable to Gabriel.[16]

Gabriel identified only $4,919.31 of the deposits into the household account as his paychecks or otherwise attributable to him. But even if Gabriel had spent $14,613.93 on the support of the Mahmoud Daya family in 1995, he still contributed $39,206.50[17] less than the money potentially available for the support of the family from Mahmoud, Fuad, and Morhaf.

---

[16] Although Gabriel held legal title to the funds in the household account, we find that Mahmoud, Fuad, and Morhaf's contributions to the account were not intended as gifts to Gabriel but that Gabriel was entrusted with the funds to meet the expenses of the Mahmoud Daya family. See supra pp. 30-31. Thus, the funds should not be credited to Gabriel for purposes of determining his contributions to the support of Mahmoud.

[17] This amount represents Mahmoud's SSI of $6,672, Mahmoud's checks from Fuad totaling $17,500, checks totaling $5,308.43 drawn by Mahmoud on Fuad's account, $3,000 drawn on the home equity line of credit, and Morhaf's net wages of $21,340, which totals $53,820.43 minus Gabriel's $14,613.93.

In 1996, Mahmoud received $7,517 of SSI.  Morhaf had wages, net of deductions and withholding, of $29,450.  As previously discussed, the record is not clear as to the extent these funds were expended for the support of the Mahmoud Daya family and as to the amount of funds provided by Fuad to the family.  It is clear, however, that at least $36,967[18] was available for the support of the Mahmoud Daya family from sources other than Gabriel in 1996.

Gabriel's 1996 wages, net of deductions and withholding, were $18,871, and he reported other income totaling $597.  Gabriel also received a check from Fuad for $1,000, which was deposited into the household account.  Morhaf wrote checks payable to Gabriel in 1996 totaling $3,500; however, Morhaf indicated that these checks were not for Gabriel's personal use but constituted his "participation in the house".  Thus, the most Gabriel could have contributed toward the support of his family in 1996 was $20,468.

Gabriel, however, provided no evidence of how much money he deposited into the household checking account in 1996, nor did he provide any evidence regarding his personal checking account in 1996.  Even if Gabriel contributed the entire $20,468 to the support of his family, there was at least $36,967 potentially available for support from other sources.

Accordingly, Gabriel is not entitled to dependency exemption deductions for his father in 1995 or in 1996.

---

[18] This figure is derived from the sum of Mahmoud's SSI of $7,517 and Morhaf's wages of $29,450.

Head of Household Filing Status

As relevant to petitioners' cases, section 2(b) defines a head of household as an individual taxpayer who is not married at the close of the taxable year, and who maintains a household which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer if the taxpayer is entitled to a deduction for the taxable year for his father or mother under section 151. An individual is considered to maintain a household only if he furnishes over half the cost of maintaining the household during the taxable year. See sec. 2(b). Expenditures considered for purposes of claiming head of household filing status are different in certain respects from those considered for purposes of the dependency exemption support test. See Teeling v. Commissioner, 42 T.C. 671, 682-684 (1964); sec. 1.152-1(a)(2)(i) and 1.2-2(d), Income Tax Regs. The cost of maintaining a household consists of the "expenses incurred for the mutual benefit of the occupants thereof by reason of its operation as the principal place of abode of such occupants". Sec. 1.2-2(d), Income Tax Regs. Such expenses include "property taxes, mortgage interest, rent, utility charges, upkeep and repairs, property insurance, and food consumed on the premises." Id.

Respondent maintains that Gabriel does not qualify for head of household filing status in 1995 or 1996 because he is not entitled to claim his father as a dependent in either year and he

did not maintain a household in either year.  Having concluded Gabriel is not entitled to dependency exemptions for his father under section 151 in 1995 or 1996, we hold that Gabriel is not entitled to head of household filing status in either year.

With respect to Morhaf, respondent concedes that he provided more than one-half of the support in 1995 for his mother within the meaning of section 1.152-1(a)(2)(i), Income Tax Regs., and as such is entitled to a dependency exemption deduction for her. Respondent, however, maintains that Morhaf is not entitled to head of household filing status in 1995 because he has not established that he paid more than half of the expenses of maintaining a household for his mother.

To determine whether Morhaf maintained a household for Laila in 1995, we first must decide what constituted Laila's household. Petitioners argue that there were two separate households within the Foster City residence during 1995 and 1996:  One consisting of Gabriel and Mahmoud and one consisting of Morhaf and Laila.[19] Although respondent agrees that it is possible for two separate households to exist under one roof, respondent argues that the members of the Mahmoud Daya family were all part of one household in 1995 and 1996.

---

[19] Although Mayar resided at the Foster City residence during 1995 and 1996, petitioners have not indicated of which household he was a member.

Both Gabriel and Morhaf testified that they lived as one family in the Foster City residence during 1995 and 1996. Gabriel testified that the family shared a kitchen and living area and that his mother bought food for the entire family. Petitioners have identified no separate expenditures for the support of individual members of the household or for the maintenance of two separate households. Nothing in the record indicates that two separate households existed within the Foster City residence. See Estate of Fleming v. Commissioner, T.C. Memo. 1974-137 (finding two separate households where common living areas were shared but each household had "private quarters" occupying an entire level of the shared house, and each household maintained a separate telephone, subscribed to its own magazines, and gave separate gifts and charitable contributions). We therefore find that the members of the Mahmoud Daya family constituted one household during 1995 and 1996.

On brief, Morhaf states that $668.74 was disbursed from his checking account during 1995 in identifiable payments for items constituting expenditures for the maintenance of a household within the definition set forth in section 1.2-2(d), Income Tax Regs. Although we are unable to determine the specific expenses which make up the $668.74 total, this number corresponds with the disbursements characterized as "Household" disbursements in the 1995 summary of disbursements from Morhaf's checking account.

Because respondent raised no objection to the amount or its classification, we treat this amount as expended for the maintenance of the Mahmoud Daya family's household in 1995.

The only other evidence of Morhaf's contributions toward the maintenance of the Mahmoud Daya family's household in 1995 consists of Gabriel and Morhaf's testimony that Morhaf gave money to his mother to deposit into the household checking account and that he gave her money for groceries.  Petitioners make no attempt to estimate these contributions, and they have provided no basis upon which we can estimate these contributions.  We thus credit Morhaf with contributing $668.74 toward the maintenance of the Mahmoud Daya household in 1995.

Although the record does not clearly reflect all the expenses incurred for maintaining the Mahmoud Daya family's household in 1995, the record does indicate that $18,606 in mortgage interest payments was made and $3,084.48 in property taxes was paid on the Foster City residence.  Morhaf has not shown that he paid any of these expenses or any other expenses for the maintenance of the household beyond the $668.74.  Morhaf has not established that he provided more than half the cost of maintaining a household for Laila in 1995.[20]

Accordingly, we uphold respondent's determination that

---

[20] We note that even if we accepted Morhaf's argument that he maintained a household for Laila separate from Gabriel and Mahmoud's household, Morhaf still has not shown that he provided more than half the cost of maintaining such a household.

Gabriel is not entitled to head of household filing status in 1995 and 1996, and Morhaf is not entitled to head of household filing status in 1995.

Mortgage Interest Deductions

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Section 163(h)(1), however, provides that, in the case of a taxpayer other than a corporation, no deduction is allowed for personal interest. Qualified residence interest is excluded from the definition of personal interest and thus is deductible under section 163(a). See sec. 163(h)(2)(D). Qualified residence interest is any interest which is paid or accrued during the taxable year on acquisition indebtedness or home equity indebtedness. See sec. 163(h)(3)(A). Acquisition indebtedness is any indebtedness secured by the qualified residence of the taxpayer and incurred in acquiring, constructing, or substantially improving the qualified residence. See sec. 163(h)(3)(B). Home equity indebtedness is any other indebtedness secured by the qualified residence to the extent the aggregate amount of such indebtedness does not exceed the fair market value of the qualified residence reduced by the amount of acquisition indebtedness on the residence. See sec. 163(h)(3)(C)(i). The amount of home equity indebtedness for any taxable year cannot exceed $100,000. See sec. 163(h)(3)(C)(ii).

The indebtedness generally must be an obligation of the taxpayer and not an obligation of another. See Golder v. Commissioner, 604 F.2d 34, 35 (9th Cir. 1979), affg. T.C. Memo. 1976-150. Section 1.163-1(b), Income Tax Regs., however, provides in pertinent part:

> Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness.

The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, construed the foregoing regulation to permit interest deductions in nonrecourse lending situations where the taxpayer is not personally liable on a mortgage. See Golder v. Commissioner, supra. Although the taxpayer is not directly liable on the debt, the taxpayer must pay the mortgage to avoid foreclosure. Thus, section 1.163-1(b), Income Tax Regs., recognizes the economic substance of nonrecourse borrowing and allows an interest deduction to a taxpayer, who, in the situations contemplated in the regulation, is not directly liable on the mortgage indebtedness. See id.

Relying on the same rationale underlying the interpretation in Golder of section 1.163-1(b), Income Tax Regs., we have held that taxpayers who do not hold legal title to property but who establish they are equitable owners of the property are entitled to deduct mortgage interest paid by them with respect to the

property.  See <u>Trans v. Commissioner</u>, T.C. Memo. 1999-233; <u>Uslu v. Commissioner</u>, T.C. Memo. 1997-551; <u>Conroy v. Commissioner</u>, T.C. Memo. 1958-6.

In the case at bar, petitioners each claimed a deduction for 50 percent of the mortgage interest incurred on the Foster City residence in 1995 and 1996.  Respondent disallowed the entire mortgage interest deductions claimed by both petitioners in 1995 and disallowed Gabriel's deduction for all but 5 percent of the mortgage interest paid on the property in 1996 on the basis that petitioners have not established:  (1) The interest associated with the indebtedness on the property was qualified residence interest; (2) they had a legal or equitable interest in the property in 1995; (3) the indebtedness on the property was theirs; and (4) they personally paid the interest.

Although petitioners offered no direct testimony that Bank of American loan No. 4540719 was acquisition indebtedness and that the total indebtedness at issue did not exceed the fair market value of the Foster City residence, we are satisfied the record sufficiently establishes that the interest paid on these loans constitutes qualified residence interest.

During 1995 petitioners had no legal obligation to make mortgage payments on the Foster City residence, nor did they hold legal title to the residence.  Mahmoud and Fuad were the legal

owners of the residence,[21] and the two loans secured by the residence were in Mahmoud and Fuad's names.  The mere fact the Foster City residence was petitioners' personal residence does not, as petitioners suggest, entitle them to deduct mortgage interest payments made on the residence.  See Loria v. Commissioner, T.C. Memo. 1995-420; Tuer v. Commissioner, T.C. Memo. 1983-441.  To be able to deduct any payments of mortgage interest in 1995, petitioners must establish that they were the beneficial or equitable owners of the Foster City residence.  See Trans v. Commissioner, supra; Uslu v. Commissioner, supra; Conroy v. Commissioner, supra.

We are unable to find any substance in petitioners' contentions that they were the beneficial or equitable owners of the residence in 1995, and we are unable to determine on what legal theory they base their claims.  Although Federal law determines the tax consequences of an interest or right in property, State law determines the nature of the interests and rights in property.  See Morgan v. Commissioner, 309 U.S. 78 (1940).  Petitioners have provided no evidence that under California law they were the beneficial or equitable owners of the

---

[21] Although petitioners argue that Fuad and Mahmoud "acquired title" to the residence and that only Mahmoud "purchased" the residence, Fuad's testimony does not support their argument:  "I bought the house and he [Mahmoud] gave me money from back home, and I put my money, so we bought it together."

Foster City residence.  See, e.g., <u>Bainbridge v. Stoner</u>,106 P.2d 423, 427 (Cal. 1940) (discussing equitable ownership arising by virtue of express, resulting, and constructive trusts).

Petitioners argue that they considered all the members of their immediate family to own the residence.  They also point to Fuad's testimony that he considered the Mahmoud Daya family to be the owners of the Foster City residence.  Fuad's testimony, however, was contradictory at times.  He also testified regarding the Foster City residence:  "That's my house, also * * * I bought it.  My name is on it."  The record as a whole suggests that Fuad was interested in helping his brother, Mahmoud, and Mahmoud's family and that he thereby purchased the Foster City residence with Mahmoud so that the family would have a place to live.  It does not follow that Fuad held bare legal title and that Gabriel and Morhaf held an equitable interest in the residence.

Although petitioners may have contributed toward the mortgage payments and property taxes due on the Foster City residence and resided in the home, these facts are insufficient to establish that petitioners held the benefits and burdens of ownership such that they could be considered equitable owners of the residence. See <u>Colston v. Burnet</u>, 59 F.2d 867, 869-870 (D.C. Cir. 1932), affg. 21 B.T.A. 396 (1930); <u>Bainbridge v. Stoner</u>, <u>supra</u>. Petitioners did not contribute to the downpayment on the residence, the record provides no evidence that petitioners made

any payments on the residence for the 12 years preceding the years at issue that they and their family resided in the home, and petitioners did not indicate they had entered into any agreement with their father or uncle that would entitle them to an ownership interest in the home.  See Trans v. Commissioner, supra; Uslu v. Commissioner, supra.

We therefore sustain respondent's determination disallowing Gabriel and Morhaf's mortgage interest deductions in 1995.

On March 20, 1996, Mahmoud executed a gift deed transferring one-fifth of his one-half interest in the Foster City residence, which gave Gabriel and Morhaf each an undivided one-twentieth legal interest in the Foster City residence.  Morhaf's 1996 tax year is not at issue, but Gabriel contests respondent's disallowance of a deduction for all but 5 percent of the mortgage interest paid on the residence in 1996.  The issue we must resolve is whether Gabriel is entitled to a mortgage interest deduction larger than his proportionate share.

Generally, a taxpayer may deduct more than his proportionate share of mortgage interest arising from property held as a tenant in common where the taxpayer paid such expenses to avoid personal liability or to preserve his interest in the property he holds as a tenant in common.  See Powell v. Commissioner, T.C. Memo. 1967-32; Conroy v. Commissioner, T.C. Memo. 1958-6.  We have found, however, that a taxpayer was not entitled to deduct more than his

proportionate share of mortgage interest where he was entitled to reimbursement for payments in excess of his proportionate share under State law, and he in fact received contribution from his cotenants. See James v. Commissioner, T.C. Memo. 1995-562.

Gabriel had no personal liability on the loans; however, his interest in the Foster City residence would have been subject to foreclosure if the mortgage payments had not been paid. See Jamison v. Cotton, 28 P.2d 39, 40 (Cal. Ct. App. 1933). California recognizes the right of a cotenant to contribution from his fellow cotenants for his mortgage payments on the common property in excess of his proportionate share. See Conley v Sharpe, 136 P.2d 376 (Cal. Ct. App. 1943); Willmon v. Koyer, 143 P. 694 (Cal. 1914).[22] Therefore, Gabriel may deduct mortgage interest payments beyond his proportionate share to the extent he actually made the payments and did not receive reimbursement from his fellow cotenants. See Powell v. Commissioner, supra; Conroy v. Commissioner, supra.

Gabriel, however, has not established the extent to which the 1996 mortgage interest payments were made with his funds. See Wells v. Commissioner, T.C. Memo. 1990-58. Although all mortgage payments on the Foster City residence in 1996 were made from the household checking account, which was in Gabriel's name, Gabriel

---

[22] It is not clear, however, whether a personal judgment against a cotenant in such a situation is obtainable. See Conley v. Sharpe, 136 P.2d 376 (Cal. Ct. App. 1943).

has failed to establish the source of all the deposits into the account. He testified that two of his cotenants, Morhaf and Fuad, contributed to the account in 1996. Assuming arguendo that Gabriel was the beneficial as well as legal owner of all the money in the household account, see supra pp. 31-32, Morhaf and Fuad's deposits into the account would constitute reimbursement for expenditures made on their behalf. Gabriel, therefore, is not entitled to mortgage interest deductions in 1996 beyond the 5 percent respondent allowed.

For the foregoing reasons, we uphold respondent's determinations with respect to petitioners' mortgage interest deductions.

Property Taxes

Section 164 allows a deduction for certain taxes, including State and local real property taxes. In general, taxes are deductible only by the person upon whom they are imposed. See sec. 1.164-1(a), Income Tax Regs. As in the case of mortgage interest, we have held that taxpayers who do not hold legal title to property but who establish they are equitable owners of the property are entitled to deduct property taxes paid by them with respect to the property. See Trans v. Commissioner, T.C. Memo. 1999-233; Uslu v. Commissioner, T.C. Memo. 1997-551; Conroy v. Commissioner, supra. Also, a taxpayer may deduct more than his proportionate share of property taxes arising from property held

as a tenant in common where the taxpayer paid such expenses to avoid personal liability or to preserve his interest in the property he holds as a tenant in common. See <u>Powell v. Commissioner</u>, <u>supra</u>; <u>Conroy v. Commissioner</u>, <u>supra</u>.

Respondent disallowed Gabriel and Morhaf's property tax deductions with respect to the Foster City residence in 1995. In 1996, respondent denied Gabriel a deduction for all but 5 percent of the property tax paid on the residence.

As previously discussed, Gabriel and Morhaf were not the legal or equitable owners of the Foster City residence in 1995. The property tax statements were in the names of Mahmoud and Fuad. Therefore, petitioners are not entitled to any deduction for property taxes paid on the Foster City residence in 1995.

In 1996, Gabriel held legal title to an undivided one-twentieth interest in the Foster City residence. Under California law, all tenants in common are duty bound to pay property taxes in proportion to their ownership interest in the commonly held property. See <u>Conley v. Sharpe</u>, <u>supra</u>. The property taxes are a lien upon real property, and their nonpayment subjects the property to sale in satisfaction of them. See <u>id.</u> Although Gabriel had no obligation to pay more than his share of the taxes due on the residence, payment of the taxes was necessary to preserve the Foster City residence and his rights and interests

therein.  See <u>Powell v. Commissioner</u>, <u>supra</u>.

Gabriel, however, has failed to establish that he paid the $1,543 he claimed as a deduction for property taxes on his 1996 return.  Although a payment in this amount was made from the household checking account in 1996, Gabriel has failed to establish the extent to which these funds are attributable to him. Moreover, the record supports a determination that he was reimbursed by his cotenants.

Accordingly, we uphold respondent's determinations with respect to petitioners' deductions for property tax.

## Section 6662(a) Penalties

Finally, we address the accuracy-related penalties of section 6662(a).  Section 6662(a) and (b)(1) provides that if any portion of an underpayment of tax is attributable to negligence or disregard of rules or regulations, then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment that is so attributable.  "Negligence" includes any failure to make a reasonable attempt to comply with the statute, and "disregard" includes any careless, reckless, or intentional disregard.  See sec. 6662(c).  We have further defined negligence as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the same circumstances.  See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).

If a taxpayer establishes that he acted in good faith and there was reasonable cause for the underpayment, the taxpayer will not be liable for the penalty under section 6662. See sec. 6664(c). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's efforts to assess his proper tax liability. See id.

A taxpayer who reasonably relies in good faith on competent professional advice may in some circumstances avoid liability for negligence penalties. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other issue 501 U.S. 868 (1991); sec. 1.6664-4(b)(1) and (c), Income Tax Regs. Such reliance, however, is "not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, supra. To establish good faith reliance on the advice of a competent adviser, a taxpayer must show: (1) That he provided the return preparer with complete and accurate information, (2) that an incorrect return resulted from the preparer's mistakes, and (3) that the taxpayer was relying in good faith on the advice of a competent return preparer. See Cramer v. Commissioner, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995).

Respondent determined petitioners' underpayments of tax are attributable to negligence. Petitioners maintain they were not negligent and that they reasonably relied in good faith on their income tax return preparer. Petitioners bear the burden of proving that the negligence penalty is inapplicable.[23] See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933); <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791-792 (1972).

Petitioners exhibited a lack of due care in determining their proper income tax liability. They both failed to maintain records to substantiate their entitlement to the deductions at issue and to head of household filing status. In 1995, both claimed deductions for expenses related to the Foster City residence when they held neither legal or beneficial ownership of the residence. Moreover, without any reasonable basis, they attributed to themselves Fuad's checks to Mahmoud totaling $17,500 in considering their entitlement to deductions and head of household filing status.

---

[23] Although petitioners make no reference to sec. 7491(c), which was enacted by the Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 685, 726, they appear to invoke its rule requiring the Secretary to carry the burden of production with respect to additions to tax. Sec. 7491(c), however, is only applicable to court proceedings arising in connection with examinations commencing after July 22, 1998. Of the three notices of deficiency giving rise to this case, two were issued prior to July 22, 1998 and one was issued on Dec. 3, 1998. Petitioners do not contend, nor are we persuaded by the evidence, that any of their examinations commenced after July 22, 1998.

Although petitioners argue they supplied their return preparer, John Zahar (Mr. Zahar), with all relevant information to determine their tax liabilities and that they reasonably relied in good faith on his determinations, the record suggests otherwise.

The record is insufficient to establish Mr. Zahar's knowledge of income tax law or that petitioners had reason to believe he was competent. Mr. Zahar had been a social acquaintance of Fuad and the Mahmoud Daya family for the past 14 or 15 years. Petitioners provided no evidence that they had Mr. Zahar prepare their returns because of his knowledge of income tax law. Although Mr. Zahar testified that he had been in the business of preparing tax returns for the last 12 years, he offered no further testimony regarding the nature of his business or his qualifications to prepare income tax returns.

Petitioners also have failed to establish they provided Mr. Zahar with all relevant information to determine their filing status and their entitlement to the deductions at issue. Mr Zahar's testimony at times was vague and somewhat contradictory. He testified he was not aware that petitioners did not hold legal title to the Foster City residence in 1995, but then he testified that he advised them to gain legal title in 1996. He indicated that his understanding of the law was that in order to take deductions with respect to a residence, a taxpayer must hold legal title to the residence. Petitioners, thus, could not have relied

on Mr. Zahar's advice in claiming deductions for mortgage interest and property taxes in 1995.

Gabriel testified that he provided Mr. Zahar with information about his income and told him that he and his brother were paying for "the house and the mortgage, and all the taxes and all the expenses. Food, drink, electricity." Mr. Zahar testified that he believed Gabriel and Morhaf were supporting the Mahmoud Daya family during the years at issue and that Fuad provided additional money to the family from "time to time". There is no evidence, however, that petitioners informed Mr. Zahar of the extent of Fuad's contributions to the family. Yet out of a total of $32,531.88 deposited into the household account in 1995, Fuad contributed at least $18,500. Without such information, Mr. Zahar could not have determined petitioners' entitlement to the deductions at issue and to head of household filing status.

Under these circumstances, petitioners have not shown they had reasonable cause for their underpayment of taxes or acted in good faith. Accordingly, we uphold respondent's determinations that petitioners are liable for additions to tax under section 6662(a).

We have considered all other arguments advanced by petitioners, and to the extent not discussed above, have found those arguments to be irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered for respondent</u>.